THE PEOPLE ex rel. HENRY C. MURPHY, President, etc., Respondent, *v.* JOHN KELLY, Comptroller, etc., Appellant.

Congress may authorize the construction of a bridge over a public navigable water, although the same will, to some extent, interfere with navigation ; and its determination as to the extent of the interference which will be permitted is conclusive.

It may devolve upon the secretary of war the power to approve or prescribe the plan for the bridge.

Accordingly *held*, that the provisions of the act of Congress passed March 3, 1869, declaring the bridge to be constructed " across the East river, between the cities of New York and Brooklyn," under the act of the Legislature of this State, incorporating " The New York Bridge Company " (chap. 399, Laws of 1867, as amended by chap. 26, Laws of 1869), to be a lawful structure, requiring the bridge company to submit a plan of the bridge to the secretary of war, and authorizing said company, on receiving a notification from the secretary that he approved the plan, to proceed to the erection of the bridge, were within the powers of Congress; also, that the secretary of war could convey such notification in any way which would be effectual; and a notice through one of his subordinates was sufficient.

The act of 1875 (chap. 300, Laws of 1875), providing for the acquiring by the two cities of the stock in said bridge company in the hands of indi-

viduals, for dissolving the corporation, and for the completion of the bridge by said cities as a public work, is not in conflict with the constitutional amendment of 1875 (§ 11, art. 8), prohibiting any city from giving money or property or loaning its credit to or in aid of, or from becoming the owner of stock in or bonds of, any association or corporation, or from incurring any indebtednes, except for city purposes; as it is the purpose of the act to extinguish the corporation, and to vest all its property in the two cities.

The indebtedness authorized to be incurred by said act for the completion of the construction of the bridge is for a city purpose; and the two cities could be authorized to take the bridge for such purpose.

A city purpose, within the meaning of said constitutional provision, includes not simply some work or expenditure within the city limits, but a public improvement which may be regarded as for the common benefit and enjoyment of all the citizens.

The legislative determination as to what is a municipal purpose will not be annulled by the courts in any doubtful case, but only where it appears to be clearly erroneous.

Also held, that as, at the time of the passage of said act of 1875, a plan of the bridge approved under said act of Congress had been adopted and acted upon and the bridge partially constructed, it was no longer necessary so to construct the bridge as in no degree to obstruct the navigation of the river, as required by the charter of said bridge company; that said act was a legislative approval and sanction of the bridge as then being constructed, according to the prescribed plan, and thereafter it was only required to conform to the plan.

So long as there was no departure from the plan, the structure cannot be assailed as an obstruction to navigation, and was not a nuisance.

The secretary of war approved of the plan for the bridge, subject to this, among other conditions: "That no guys or stays shall ever be attached to the main span of the bridge which shall hang below the bottom chords thereof." In proceedings to compel by mandamus the payment by the comptroller of the city of New York to the trustees of moneys, as prescribed by said act of 1875, it was claimed by defendant that this condition had been violated. Held, that if there was such a departure from the approved plan, it did not justify the defendant in withholding payment of the money.

As to whether temporary guys or stays used only in the construction of the bridge are within said condition, quære.

So also, held, that the fact that the trustees were extravagant in the expenditure of moneys, and that the bridge, when completed upon the plan so adopted, will be useless and unsafe, did not justify defendant's refusal.

A custodian of public funds, directed by law to pay them to persons charged with the duty of expending them, cannot withhold payment because of the apprehended extravagance of those charged with that duty.

The proviso in said act of 1875, " that the whole amount to be paid by both cities shall not exceed eight millions of dollars," does not prohibit a further

prosecution of the work, although it cannot be completed for the sum named; nor does it prevent the trustees from calling upon the two cities for that sum, or the cities from paying it. (CHURCH, Ch. J., FOLGER and MILLER, JJ., dissenting.)

It was not the legislative intent to abandon the structure if the expense of completion could not be kept within the limit named, but simply to limit the sum that could be expended under the act. The trustees were thereby authorized to proceed with the construction, and to draw for the sums needed until the amount appropriated was exhausted, and then were to wait for further legislative authority. (CHURCH, Ch. J., FOLGER and MILLER, JJ., dissenting.)

(Argued February 11, 1879; decided March 25, 1879.)

APPEAL from order of the General Term of the Supreme Court, in the first judicial department, reversing an order of Special Term, which denied an application for a writ of mandamus; and directing that a peremptory writ issue "addressed to John Kelly, comptroller of the city of New York, commanding him as said comptroller forthwith to borrow on the faith of the mayor, aldermen and commonalty of the city of New York, the sum of $1,000,000, being the amount of two certain calls made by the trustees of the New York · and Brooklyn Bridge, on the city of New York, by request made to the mayor and comptroller thereof, the one dated the 4th of March, 1878, and the other the 5th day of August, 1878 ; that, for such purpose he, as such comptroller, issue the bonds of said city of the form and character, and in the manner prescribed by a certain ordinance of the common council of said city, passed the 8th day of May, 1876, and set forth in the moving papers of the relator, and that out of the proceeds of said bonds, he, as such comptroller, pay over to said trustees of the New York and Brooklyn Bridge the sum mentioned in the two calls aforesaid, to wit: in all the sum of $1,000,000."

The facts appear sufficiently in the opinion.

*Wm. Henry Arnoux* and *Geo. F. Comstock*, for appellant. Chapter 300, Laws of 1875, was in direct conflict with the constitutional amendment of January 1, 1875. (Const.,

art. 8, § 1; *People* v. *Albertson*, 55 N. Y., 50; *People* v. *Shepard*, 36 id., 285; *People* v. *Daper*, 15 id., 532.) The limitation of the expenditure to $8,000,000 limited the power of the trustees to demand, or of the cities to grant more, and was also a limitation upon the cost of the bridge, so that when it appeared the cost would exceed that sum, the work could not proceed without further power from the Legislature. (*Amey* v. *Allegheny*, 24 How. [U. S.], 364; *McDonald* v. *Mayor*, etc., 68 N. Y., 23, 28; *Peterson* v. *Mayor*, etc., 17 id., 449; *Burr* v. *Peck*, 10 id., 294; *Wallace* v. *Mayor*, etc., 29 Cal., 180, 187; *Wyncoop* v. *Cong. Soc.*, 10 Iowa, 185; *Parsons* v. *Goshen*, 11 Pick., 399; *Donovan* v. *Mayor*, etc., 33 N. Y., 291; 1 U. S. R. S., § 3723; Dil. Munc. Corp. [2d ed.], § 381; *Cook* v. *Comrs. Ham. Co.*, 6 McL., 112, 119; *Water Works City of Salem*, 14 Al., 87; *Guidet* v. *Mayor*, etc., 4 J. & S., 557; *Rice* v. *City of Keokuk*, 15 Iowa, 579, 583; *Morris* v. *U. S.*, 15 Pet., 445; *In re Webb*, 24 How Pr., 247; *Dilleber* v. *Home L. Ins. Co.*, 69 N. Y., 256; *In re Second Ave. Church*, 66 id., 395.) The bridge, as it was being constructed, interfered with navigation, and so violated both the laws of this State and of the United States. (*Wheeling Bridge Case*, 13 How. [U. S.], 564; *Blanchard* v. *West. Un. Tel. Co.*, 60 N. Y., 510; *Amory* v. *Fox*, 1 Abb. [U. S.], 246; *State* v. *Parrott*, 71 N. C., 311; 17 Am. R., 5; *State* v. *Dibble*, 4 N. C., 107, 115; *Rennick* v. *Morris*, 3 Hill, 621; *James* v. *Hayward*, Cro. Car., 184; *Bateman* v. *Burge*, 6 C. & P., 391; *Phyfer* v. *Cox*, 21 Ohio St., 248; 8 Am. R., 58.)

*Wm. M. Evarts, A. J. Vanderpoel* and *Edgar M. Cullen*, for respondent. The provision of the act of 1875, limiting the expenditure to $8,000,000, is not to be so strictly construed as to defeat the work. (*Ketchum* v. *City of Buffalo*, 14 N. Y., 356; 21 Barb., 294; *Meech* v. *City of Buffalo*, 29 N. Y., 212; *Damon* v. *Granby*, 2 Pick., 352; *Simons* v. *Head*, 23 id., 120; *Foote* v. *City of Salem*, 14 Al., 87; *People ex rel. Navarro* v. *Van Nort*, 64 Barb., 205; *Greene* v. *Mayor*,

*etc.*, 60 N. Y., 303; 1 Hun, 24; 1 R. S. [U. S.], § 3732; 4 Opinions U. S. Atty. Genls., 600; 6 id., 26, 28; *Cook* v. *Comrs. of Hamilton*, 6 McL., 112–119; *U. S. Marine Hospital in New Orleans*, 12 Ct. of Cl., 147, 163; *Hoppikins* v. *Comrs.*, 16 Cal., 248; *Kinsey* v. *Pulaski Co.*, 2 Dill., 253; *Ireland* v. *Rochester*, 51 Barb., 414, 427; *Foote* v. *City of Salem*, 14 Al., 87; 6 Opinions U. S. Atty. Genls., 26; *Guilder* v. *Dayton*, 22 Minn., 366; *Conners* v. *Nichols*, 14 Ohio St., 206; *Town of Coloma* v. *Eaves*, 92 U. S. [Otto], 148; *Schanck* v. *Mayor, etc.*, 69 N. Y., 444; *McPherson* v. *Foster*, 43 Iowa, 48, 72; *Hadden* v. *The Collector*, 5 Wall., 107; *Hyatt* v. *Taylor*, 42 N. Y., 259; *People ex rel. Cornell* v. *Norton*, 12 Abb. Pr. [N. S.], 47.) There was nothing in the statutes, prior to 1875, relating to the bridge, manifesting an intent that the language of section 3 should be construed as imposing a limit on the plan or entire cost, effective as a condition precedent to the validity of incurring expense within that limit. (*Barry* v. *Mer. Ex. Co.*, 1 Sand. Ch., 280, 298–340; *People* v. *Suprs. of Dutchess*, 1 Hill, 50; *People* v. *Ingersoll*, 58 N. Y., 1, 30; *Chicago* v. *McGraw*, 75 Ill., 566; *Barnes* v. *District of Columbia*, 91 U. S. [Otto], 540, 551; Laws 1874, 927, 928; 1 R. S. [6th ed.], 88.) The act of 1875 is not obnoxious to the amendment to the constitution of January 1, 1875. (Laws 1874, 933; 1 R. S. [6th ed.], 102; Laws 1871, 525, chap. 268; Laws 1870, 452, 864, 1695; Laws 1873, 949; Laws 1868, 717; Laws 1841, chap. 225; *Hurlbert* v. *Banks*, 1 Abb. [N. C.], 157; *People ex rel. Kilmer* v. *McDonald*, 69 N. Y., 362; *City of Phila.* v. *Field*, 58 Penn. St., 320; *Guilder* v. *Town of Otsego*, 20 Minn., 74; *Guilder* v. *Town of Dayton*, 22 id., 366; Burroughs on Taxation, 75, § 57; *Un. Pac. R. R. Co.* v. *Comrs.*, 4 Neb., 450; *Hill* v. *Suprs. Livingston*, 12 N. Y., 52; *Convery* v. *Rice*, 4 Lans., 141; *Beckwith* v. *Whalen*, 5 id., 370; *Shaw* v. *Dennis*, 5 Gilm. [Ill.], 405; *Thomas* v. *Leland*, 24 Wend., 65; *Comm.* v. *Newburyport*, 103 Mass., 129; *Carter* v. *C. and Bklyn. Bridge*, 104 id., 236; *Douw* v. *Wakefield*, 103 id., 267; *Waterville* v. *Kenne-*

*beck Co.*, 59 Me., 80; *Matter of Zborowski*, 68 N. Y., 96; *People ex rel. Kilmer* v. *McDonald*, 69 id., 365; *People ex rel McLean* v. *Flagg*, 46 id., 601; *People ex rel. Dunkirk, etc., R. R. Co.*, 53 id., 128, 140; *Ritchie* v. *Franklin Co.*, 22 Wall., 67; *People ex rel. Wood* v. *Met. Police*, 15 N. Y., 532; *People* v. *Pickney*, 32 id., 377; *Rusch* v. *City of Davenport*, 6 Iowa, 443, 450; *Weismer* v. *Village of Douglas*, 64 N. Y., 91, 99; 6 Sup. Ct. [T. & C.], 514; FOLGER, J., and see *Bank of Rome* v. *Village of Rome*, 18 N. Y., 38.) No action by the board of estimate and assessment was necessary. (Laws 1873, p. 517, chap. 335, § 112; id., 518; *People ex rel. Schanck* v. *Green*, 64 N. Y., 499; 6 Hun, 11; *People ex rel. Myner* v. *Board of Assessors and Green*, 53 How. Pr., 280, 284.) As to the obstruction to navigation, the decision of the secretary of war was conclusive. (*Miller* v. *Mayor, etc.*, 13 Blatch., 469.) The practice of the relator in this case was proper. (Tapping on Mandamus, 316, 325; *Rex* v. *Obigdon*, 2 Salk., 699; *People* v. *Common Council*, 3 Keyes, 81; *Mayor, etc.*, v. *Lord*, 9 Wall., 409; Dillon on Munc. Corp., § 699; Moses on Mandamus, 200; *People* v. *Suprs. of Sullivan*, 56 N. Y., 249; *People* v. *Collins*, 19 Wend., 56; *People* v. *Flagg*, 16 Barb., 503; *People ex rel. Taylor* v. *Brennan*, 39 id., 522; *People ex rel. McSpedon* v. *Haws*, 34 id., 69; *Rex* v. *Middlehurst*, 1 Wells, 283; *Comm.* v. *Comrs. Alleghany*, 37 Penn St., 237, 277; *People ex rel. Duffin* v. *Earle*, 46 How., 308; *People ex rel. Hawley* v. *Earle*, id., 267.)

EARL, J. By the act, chapter 399 of the Laws of 1867, certain persons were incorporated as " The New York Bridge Company," for the purpose of constructing and maintaining a permanent bridge over the East river, between the cities of New York and Brooklyn. The capital stock of the company was fixed at $5,000,000, and full authority was conferred upon it to construct the bridge, and to acquire the necessary lands for that purpose. The bridge was required to be not less than one hundred and thirty feet above high

tide at the middle of the river, and was to be so constructed as not to obstruct the free and common navigation of the river. The two cities were authorized to subscribe to the capital stock of the company, such amount as two-thirds of their common councils respectively should determine ; and they were also authorized to take the bridge, and acquire all the property therein, upon terms specified in section seven of the act.

Under that act the city of New York subscribed to the stock of the company, $1,500,000, and the city of Brooklyn subscribed $3,000,000, which subscriptions were paid.

On the 20th day of February, 1869, an act (chapter 26 of that year) was passed, amending the prior act. It provided that the two cities should be represented in the board of directors of the company, by certain of their officers, and that the company should proceed without delay to construct the bridge.

On the 3d day of March in the same year, an act of Congress was passed, entitled "An act to establish a bridge across the East river, between the cities of Brooklyn and New York, in the State of New York, a post road." It declared the bridge to be constructed under the first act above mentioned, when completed in accordance with that act, to be a lawful structure and post road for the conveyance of the mail of the United States, provided that it should be so constructed as not to obstruct, impair, or injuriously modify the navigation of the river. The bridge company was required to submit to the secretary of war, a plan of the bridge, together with other information, so that he might determine whether the bridge when built would conform to the prescribed conditions as to obstructing, impairing, or injuriously modifying the navigation of the river ; and the secretary of war was authorized and directed upon receiving such plan, and other information, and upon being satisfied that a bridge built on such plan would conform to the prescribed conditions, to notify the company that he approved the same, and upon receiving such notification, the

company was authorized to proceed to the erection of the bridge, conforming strictly to the approved plan.

The East river is a public navigable water, and to bridge it required the concurrent authority of the State of New York, and of the United States ; of the former, by reason of its rights in the lands on the shore, and under the water, and of its qualified sovereignty over the water ; and of the latter, by reason of the exclusive power of Congress to regulate commerce, and to determine, in its regulation thereof, to what extent navigation upon the water may be obstructed or interfered with.

That Congress may authorize a bridge over a public navigable water which will to some extent obstruct or interfere with navigation, cannot be disputed. (*Wheeling Bridge Case*, 13 How. [U. S.], 519 ; 18 id., 421; *Miller* v. *The Mayor*, 13 Blatch., 469.) In 18 How. it is said : " The power of Congress to regulate commerce, includes the regulation of intercourse and navigation, and consequently the power to determine what shall or shall not be deemed in judgment of law, an obstruction of navigation." In 13 Blatchford, a case involving this bridge, Judge JOHNSON after reviewing the authorities said : " It results from the cases considered, that the authority of Congress is paramount, in the regulation of commerce, under the constitution ; and that its determination in respect to interference with navigation, by obstructions thereto, is conclusive. What it authorizes may be justified upon its authority. What it forbids is necessarily unlawful. Nor is it to be forgotten that this power of Congress is at all times capable of exercise. If it should turn out that the judgment of Congress has been mistaken, it can by law require the bridge to be altered, or removed, and can adapt its regulation of commerce to its view of the public interests."

Congress in the exercise of its power to regulate commerce and navigation, could itself approve the plan of the bridge, or it could prescribe a mode in which it could be done. Hence it was competent for it to devolve upon the secretary

of war, the power to approve or prescribe the plan for the construction of the bridge. By so doing it did not abdicate its power, but provided an agency, as it does in most other cases, for the complete and practical exercise of its power; and it still retained control of the whole subject by the power expressly reserved, at any time to alter, amend, or repeal the act.

In compliance with the requirement of the act, the bridge company submitted a plan of the bridge to the secretary of war, which was approved by him subject to certain conditions. One of the conditions was that the main span of the bridge should not be less than 135 feet in the clear, above high water; and another was " that no guys or stays shall ever be attached to the main span of the bridge, which shall hang below the bottom chords thereof." And on the 21st day of June, 1869, he notified the bridge company of such approval. The act of Congress did not provide how such notice should be given, and hence the secretary of war having himself considered and approved the plan, could convey such notification in person or by mail, or in any other way which would be effectual. He did it through one of his subordinates, and it cannot be doubted that that was a compliance with the act.

Having thus the authority of Congress, and of the State Legislature, the bridge company proceeded with the construction of the bridge, until the year 1874. During that time it was under obligation, under the State law to construct the bridge so as not to obstruct " the free and common navigation of the East river; " and under the act of Congress, to construct it according to the plan approved by the secretary of war.

In June 1874, another act was passed by the State Legislature, (chap. 601, of that year), entitled An act to amend the act of 1867, " and to provide for the speedy construction of the said bridge." Section *one* of the act provided that when the two cities should by vote of their common councils respectively, or when either of them should accept

the provisions of the third section of the act, and when the owners of two-thirds of the private stock of the bridge company should accept the provisions of the second section, then and thereafter, the board of directors of the company should consist of twenty members, eight persons to be appointed by the mayor and comptroller of each city, and such mayors and comptrollers. Section *two* provided that whenever any private stockholder of the bridge company should give his assent to that act by an instrument in writing, signed, acknowledged, and recorded as prescribed, the directors to be appointed under the act were authorized to purchase the rights of such stockholder, which rights were to be determined by the amount paid by such stockholder together with interest, and to provide for the payment of such amount. Section *three*, declared the bridge to be a public highway for the purpose of rendering the travel, between the two cities, certain and safe at all times, subject nevertheless to such tolls and prudential and police regulations, as the board of directors should from time to time establish; and for the purpose of completing the bridge, the two cities, in addition to the amounts before subscribed by them, were respectively authorized to take and pay for further stock, the city of New York to the extent of $1,000,000, and the city of Brooklyn $2,000,000.

The effect of that act was to leave the bridge company as a corporation still in existence, and the two cities might or might not own all the stock; and before any subscriptions to the stock were made under that act by the two cities, the constitutional amendments took effect, January 1, 1875, section 11 of article 8 of which provides as follows: "No county, city, town, or village shall hereafter give any money or property, or loan its credit to, or in aid of any individual, association, or corporation, or become directly, or indirectly the owner of stock in, or bonds of any association or corporation, nor shall such county, city, town, or village be allowed to incur any indebtedness, except for county, city, town, or village purposes."

After this provision became a part of the State constitution, the legislative act of 1874 could not be carried into effect, and to obviate the obstacle thus interposed, another act was passed May 14, 1875, entitled "An act providing that the bridge in the course of construction over the East river, between the cities of New York and Brooklyn, by the New York Bridge Company, shall be a public work of the cities of New York and Brooklyn, and for the dissolution of said company, and the completion and management of the said bridge, by the said cities." Section *one* provides that whenever two-thirds of the private stock of the company shall have been retired from the company by purchase, as provided by the act of 1874, the company shall be dissolved, and the debts and liabilities of the same shall be paid by the trustees of the bridge, and the bridge then in course of construction shall be completed and managed as provided in the act on behalf of the two cities, as a consolidated district, for that purpose ; and then the act of 1874 is recited at length.  Section *two* provides that within twenty days after the passage of the act, the mayor, comptroller, and president of the board of aldermen of the city of New York shall appoint eight trustees, and the mayor, comptroller and city auditor of the city of Brooklyn shall also appoint eight for the purpose of managing and constructing the bridge; and the trustees thus appointed, together with the mayors and comptrollers of the two cities shall constitute the board of trustees of the bridge, and shall have full power, control and direction over the plan and construction of the bridge.  Section *three* provides that after the dissolution of the company, the bridge shall be a public work to be constructed by the two cities for the accommodation, convenience, and safe travel of the inhabitants of the district, composed of the two cities ; and that the expense of constructing and maintaining the same shall be defrayed by the two cities in the proportion of two-thirds by the city of Brooklyn, and one-third by the city of New York ; and that for such purpose, the trustees shall from time to time as they shall deem necessary, call upon

the cities for such sums as they shall deem proper in the proportions mentioned, "provided, however that the whole amount to be paid by both cities, shall not exceed eight millions of dollars, and the city of New York shall not be called upon to pay a greater sum than one million dollars in any one year, and the city of Brooklyn not more than two millions in any one year, until the said bridge shall be fully completed, and open for public travel." By sections *five* and *seven*, the trustees are given full power and authority to purchase and hold for the two cities all real estate necessary for the bridge, to establish ordinances and laws regulating the use thereof, and the rates of toll for travel over the same, and to keep and maintain the same in good repair at the expense of the two cities. Section *eleven* provides that if any private stockholder of the company shall have declined to sell his rights in the company as provided in section two of the act of 1874, the trustees are authorized to proceed at once to acquire the same for and in behalf of the two cities, in the manner provided in the preceding section for acquiring real estate. Section *twelve* provides that upon the dissolution of the bridge company as provided in the act, the bridge and all its appurtenances, shall vest absolutely in, and belong to the two cities.

After the passage of that act, the trustees mentioned therein, were appointed. All the private stock of the bridge company was purchased as provided in the acts, and the company was dissolved. The trustees proceeded with the construction of the bridge, and received for that purpose from the two cities upwards of $5,000,000, $1,500,000 of which was from the city of New York, and in 1878, they made upon the city of New York two calls of $500,000 each, which are the subject of the present controversy.

The act of 1875, is not, as claimed by the appellant, in conflict with the constitutional provision above recited. It was not the purpose or effect of the act, to make the city of New York a stockholder in the bridge company, or to cause it to loan any money, or credit

to such company.   It was the purpose of the act to extinguish the company, and vest all its property in the two cities for a public purpose.   The cities already owned most of the stock and property of the company, and a way was provided by which they could become the owners of the balance of the property.   This was to be accomplished by voluntary agreement with the private stockholders, and the payment to them of the value of their stock, and in case they could not make such purchase, then such property was to be taken by the exercise of the right of eminent domain.  The two cities could be authorized to take this bridge for a public purpose, as they could be, to take any other property for the same purpose, and the act provided the mode in which through the trustees they could do it.   All the money they paid for stock or upon the debts of the company, was simply in furtherance of. the purpose to vest the property of the bridge in the two cities, and it was not paid to aid the com pany, or to make the cities stockholders therein.   The effect was to be the dissolution of the company, and the transfer of its property.   Nor can it be said that the indebtedness authorized to be incurred by the cities for the construction of the bridge, was not for a city purpose.   It is impossible to define in a general way with entire accuracy, what a city purpose is, within the meaning of the constitution.   Each. case must largely depend upon its own facts, and the meaning of these words must be evolved by a process of exclusion and inclusion in judicial construction.   It would not be a city purpose for the city of New York to build a railroad from that city to Philadelphia, or to improve the navigation of the Hudson river generally, between that city and Albany, although incidental benefits might flow to the city.   Such works have never been regarded as within the legitimate scope of municipal government.   On the contrary, it would be a city purpose to purchase a supply of water outside of the city, and convey it into the city, and for such a purpose a city debt could be created.   So lands for a park for the health and comfort of the inhabitants of a city could be pur-

chased outside of the city limits, and yet conveniently near thereto. Such improvements are for the common and general benefit of all the citizens, and have always been regarded as within the scope of municipal government; and so, too, highways or streets leading into a city or village may be improved, provided the improvements be confined within such limits that they may be regarded as for the common benefit and enjoyment of all the citizens. It cannot therefore, well be held, as claimed by the learned counsel for the appellants, that what is meant by a city purpose, is some work or expenditure within the city limits. There could be no good reason for such a limitation. It could be no worse for a city to incur debt for a city purpose outside of the city limits than for one within such limits, and there is just as much reason for allowing it to be incurred in the one case as in the other. The cities of New York and Brooklyn are intimately connected in many ways, by business, social, and commercial ties. Thousands who do business in the one city, do business in the other. The port of New York includes the whole river at the place where the bridge is to be constructed, and the commerce from all parts of the world, which flows into that port, is discharged on each side of the river. To bridge such a water separating two such cities, must be a city purpose of each city. The bridge will be for the common benefit of all the citizens of both cities, and each citizen will have the same right to use it as every other citizen. It would have been a city purpose if either city had been authorized to build the whole of the bridge, and it is no less so that both are to unite in building it. It has always been the policy of this State for two towns separated by a stream of water, to bridge the stream at joint expense, and the construction of such a bridge is a town purpose of each town. If the Legislature could not authorize these two cities to incur debt for the construction of this bridge, then it could not authorize towns to incur debt for the construction of bridges over streams dividing them. That it was intended by this clause in the constitution to

prohibit towns from incurring debt for such a purpose, will not, it is believed, be claimed by any one. Suppose this river had been like the Thames in London, or the Seine, in Paris, wholly within the city of New York, it would not be disputed that it would have been a city purpose to bridge it. Can it be any less so that the river divides what would otherwise be one city? Suppose this river had been a small stream, like those usually dividing towns which could be crossed only by a bridge, would not the construction of the bridge have been a city purpose, just as its construction would have been a town purpose, if it had been between two towns? The size of the river, and the magnitude of the work certainly does not strip the bridge of the municipal character which it would otherwise have. The Legislature when legislating in view of this constitutional limitation, must determine in the first instance what is a municipal purpose. Its decision is not however final. When its act is challenged as in conflict with this constitutional limitation, the courts must determine whether debt is authorized to be incurred for a purpose not municipal. But as the dividing line between what is a municipal purpose, and what is not, is in many cases shadowy and uncertain, great weight should be given by the courts to the legislative determination, and its action should not be annulled unless the purpose appears clearly to be one not authorized. As said by Judge FOLGER in Weismer v. Village of Douglas (64 N. Y., 91), "If the purpose designed by the Legislature lies so near the border line, that it may be doubtful on which side of it it is domiciled, the courts may not set their judgment against that of the law makers."

It is not perceived for what purpose the language as to a consolidated district found in the first section of the act of 1875, was inserted. Whatever the purpose was, it has no bearing upon the constitutional questions involved. The bridge was to be constructed and managed by the two cities, and when completed was to belong to the two cities as tenants in common, each owning a share proportionate to the

money contributed by it. So far as I can perceive this language could be stricken from the act without in any way impairing any of the essential provisions of the act, or affecting the purpose to be accomplished by it.

Therefore, having nothing to say about the wisdom of the legislation under consideration, I am confident in the conclusion that the construction of this bridge is a city purpose of each city, and that each city can incur debt for the same, and that the act of 1875 is not in conflict with any provision of the constitution.

After the passage of the act of 1875, it was no longer necessary so to construct the bridge as in no degree to obstruct the free and common navigation of the river as required by the act of 1867. At the time of the passage of the act of 1875, a plan of the bridge, approved under a public act of Congress, had for some years been adopted and acted upon. That plan showed precisely to what extent the bridge would obstruct navigation upon the river, and more than five millions of dollars had been expended upon the bridge. The plan and character of the bridge must be assumed to have been known to the Legislature, and the act of 1875 is an act providing for the completion of the bridge then in course of construction, and the trustees to be appointed under that act are required to complete that bridge. There was then a legislative approval and sanction of the bridge as then being constructed according to the plan prescribed by the act of Congress, and thereafter the trustees were required only to conform to the plan thus adopted and approved in the construction of the bridge. So long as there is no departure from such plan, the structure could not be assailed as an obstruction to navigation. What is thus sanctioned both by the State and national legislatures, cannot be a nuisance, or otherwise unlawful.

There is no allegation on the part of the defendant, that there has been any departure from the approved plan in the construction of the bridge except in one particular, and that is as to the guys or stays. He alleges that

guys or stays have been, and are attached to the main span
of the bridge which hung below the bottom chords thereof.
There is no allegation that these guys or stays are to become
a permanent part of the bridge ; but they are used only, as
seems to be conceded, in the construction of the bridge ; and
it may well be doubted, whether such temporary appliances
are within the condition prescribed by the secretary of war.
But if these guys or stays are unauthorized, such a departure
from the approved plan would not justify the defendant in
withholding the payment of this money. The duty is not
imposed upon him, as comptroller of the city, to see that
there is no departure from the plan in the construction of
the bridge. He is to pay the money when properly called
for, and then it is the duty of the trustees of the bridge to
properly apply and expend it. If they do not discharge
their duty, if they commit a breach of trust, or if they dis-
regard the plan in any material matter, the defendant as one
of the trustees can go into the proper courts, State or Fed-
eral, and compel an observance of their duties, and conform-
ity to the plan.

The defendant also alleges as a justification of his refusal
to pay that the trustees are extravagant in the expenditure
of the money intrusted to them, and that the bridge will
be useless and unsafe when completed upon the present
plan. These matters do not justify the defendant's refusal.
The trustees are appointed pursuant to law to disburse
the money. In its disbursement there may be a certain
amount of extravagance and wastefulness flowing from
misjudgment or folly, for which there is no remedy. But if
they be carried to such an extent as to be reckless and crim-
inal, a court of equity, upon proper application to it, may
restrain and control the trustees to prevent the waste of the
trust funds. The defendant is a member of the board of
trustees, and as such has opportunities of knowing how the
money is expended. If he cannot as a member of the board
prevent its waste, he may take preventive action in the courts.
But he cannot refuse to pay the money. The money thus

paid may not be wasted. It would be quite a novel doctrine that the custodian of public money directed to pay it to persons charged with the duty of expending it, could withhold payment because of the apprehended extravagance of those appointed by law to expend it.

The issue as to whether the bridge will be useless and unsafe could not be tried in this proceeding. The Legislature has directed the bridge to be completed, and has sanctioned the plan adopted. It authorized the appointment of trustees who were given " full power, control, and direction over the plan and construction of the bridge," and it made it the duty of the defendant as comptroller to pay the money to them. He cannot withhold payment because in his judgment the bridge will be useless and unsafe or because it will in fact, to a large extent, be so.

But the most serious question is yet to be considered. The defendant claims that the bridge cannot be completed save at a total expenditure of much more than $8,000,000 and that under the act of 1875, the trustees had no power to proceed with the construction of the bridge and to call for any money from the two cities, and that the cities had no power to pay any money to the trustees, unless the bridge could be completed for not more than the sum of $8,000,000. A careful consideration of the whole subject has constrained us to take a different view of that act.

The Legislature has at all times apparently regarded this bridge as of great importance to the two cities, and has appeared to be solicitous about its completion. In the first act, that of 1867, it authorized the two cities to subscribe an unlimited amount to the capital stock of the company, and ultimately to become the absolute owners of the bridge. It conferred upon the company, the sovereign power to take lands for the purposes of the bridge, by the right of eminent domain, thus treating it like corporations organized to construct railroads, in which the public are supposed to have an interest. In the act of 1869, it provided for a representation of the two cities by three of the principal officers of

each city in the board of directors, and directed the company to proceed with the completion of the bridge without delay. The act of 1874 was entitled an act among other things " to provide for the speedy construction of the bridge," and the scheme of that act was to place the company under the control of the two cities, and vest all the stock of the same in the two cities. The directors to be appointed under that act were to hold office until the completion of the bridge. The act declared the bridge to be a public highway; and for the purpose of completing it authorized the two cities to advance further sums of money, and take stock therefor, and it provided for the application of the income of the bridge after its completion. All the provisions looked to a completion of the bridge, and no limitation was placed upon the cost thereof. The act of 1875, is entitled an act, among other things, providing for the completion and management of the bridge. The whole act has in view the completion of the bridge and its management after completion. It is provided that it " shall be completed and managed as hereinafter provided for and on behalf of the cities ; " that the plan and construction thereof shall be under the control and direction of the trustees ; that it shall be a public work to be constructed by the two cities : and that the expense of constructing and maintaining it, shall be defrayed by the two cities in the proportion mentioned : and then it is provided that the trustees shall call upon the cities for the needed funds "provided however that the whole amount to be paid by both cities, shall not exceed eight millions of dollars." There is no requirement that the trustees shall first estimate the cost of the entire bridge, or that they shall not enter upon the construction thereof unless the expense can be kept within $8,000,000. If it had been intended that the trustees should not enter upon the completion of the bridge, without first determining that in no event it should cost more than that sum, a matter of such controlling importance would have been expressed in plain and explicit language. When the entire legislation

upon the subject is considered, the inference is not warranted that the Legislature meant that the structure then partially completed, upon which upwards of $5,000,000 had been expended, should be abandoned, unless the expense of its completion could be kept to the sum mentioned.

The construction of the bridge was a work of great magnitude, unparalleled in the world. The difficulties that might have to be encountered, could not be foreseen. It was a work requiring some years for its completion, and the fluctuations in the price of material and labor could not be anticipated. Another uncertain element in the cost of the bridge was the interest on all sums advanced by the two cities from time to time, which was to be added to the cost, and no one could forecast the amount of interest which would thus accumulate by necessary delays in the completion of the bridge. The nature of the work was such that it could not have been expected that it could be let by contract. These considerations show that it would have been impossible to estimate in advance the precise or even proximate cost of the bridge. And yet if the contention of the defendant be sound, if the trustees had first made an estimate bringing the cost within the sum named, and they or their successors had entered upon the construction of the bridge, and if it had subsequently unexpectedly and unavoidably turned out that the cost would exceed that sum by a few thousand dollars, the whole expenditure would have been unauthorized and illegal, the trustees disbursing the moneys in good faith, would have been personally liable, and the bridge itself would have been an unlawful structure. A construction reaching such a result cannot be the correct one. The Legislature intended the bridge should be completed. The work was of such exceptional character, that it did not know, and no one could know what it would cost, and hence no limit was placed upon its cost. It was probably supposed that the $8,000,000 would be sufficient to complete the bridge, and that was the amount appropriated or made available for the trustees. It was a limit to

the amount which they could draw from the two cities, and was a constant admonition to them to keep the expenses within that sum.    But they were to go on with the construction of the bridge, and were authorized to draw for that sum if needed, and when they had drawn to that limit they were to stop, and await further legislative authority.    The Legislature could then authorize more money to be paid by the two cities, or could appropriate sufficient money from the State treasury.    The proviso was, not that the bridge should not cost over $8,000,000, or that it should not be constructed if it was to cost more, but that the two cities should not be called upon to pay more.

I have carefully examined the authorities cited on the argument upon the point last discussed, and find nothing in any of them, having any important bearing, and hence they are not referred to here.

Having thus given this case the careful examination, its magnitude requires, I feel confident in the conclusion, that the order appealed from is right, and should be affirmed.

Folger, J. (dissenting).    The question which has most grasped my mind, is whether the Legislature meant to fix a bound to the cost of the bridge.    I have been led to think that it did.    Such, it seems to me, is the true construction of the act of May 14, 1875.

I am aware of the rules of law ; that a grant of general power carries with it the right to do everything that is needful or fairly incidental to the due execution of that power (*Foote* v. *Salem*, 14 Allen, 92); and that where there is no express limitation upon the power given, an inferential or implied limitation that would defeat the object of giving the power, cannot be made or sustained (*Cook* v. *Commrs.*, etc., 6 McLean, 112); and as following therefrom, that if a statute, giving a power and making it a duty to construct a public work, provides an appropriation in a sum named, the sum does not by inference or implication define or limit the power.

But when all this is conceded, it is also to be conceded, that the Legislature may, in its wise foresight, give a power and express the gift in general terms, and yet fix the bound of cost beyond which the use of the power cannot go. Thus, when a general act declares that no contract shall be made by certain officers of government, save under a law authorizing the same, or under an appropriation big enough for the fulfillment of it, and an act then gives power to cause a public work to be constructed, it is not enough to warrant a contract for the work; there must be power thereto in express terms, or an appropriation large enough for it. So that it comes at last to this, whether by the words used in an act, the Legislature, though it has given power in general terms, has not also put a bound to the cost. In my judgment, both the words used in this act, and the help to the interpretation of them yielded by the legislation *in pari materia*, show that the Legislature meant to name a sum which should be the bound of cost.

It is with modest feeling that I suggest, that the question has been hidden somewhat in mistaken analogies. The act has been treated as one providing for the doing of a work of that general public, of which the Legislature is the prime representative in giving the power and directing the raising of means; and as one providing that one set of public agents shall make the plans and do the work and make payment therefor, and another set of public agents raise the means of payment and hand them over on call. The case is not that, nor like that. The act, at the point of view at which we now are, is simply this : One which permits the two cities to complete the bridge, and to pay therefor by money raised by bonds, ultimately to be redeemed by the avails of taxation. The provision for trustees, though seeming to form a body of some importance, is merely the making of a new set of municipal agents. What they do is for the cities, and not for themselves, nor for any other principal. The parties to the act are only the Legislature and the two municipal bodies. We should look upon them thus : The two cities

ask from the Legislature its permission to finish the bridge. The Legislature says to them : You together may finish the bridge ; you may pay therefor by your bonds ; but the whole amount to be paid by you both, for that purpose shall not exceed $8,000,000. To say that this does not restrict the cost, it appears to me, is to rest in names, and not reach things. Only these two cities can finish the bridge ; only they can pay therefor ; yet they can pay no more than a sum named. When that sum has been used in bridge building, the work must stop. It may need more to finish it ; but as no more can be paid out to finish it, it can cost no more. That is to say, there is then no lawful power to lay out another cent upon it. The force of the act has been spent. Who is to say that the Legislature will again give power to raise and expend other millions or thousands ? Until the Legislature does give power, no more can be raised and expended ; and until then, that structure can never be of any more cost to the two cities. Whatever be its stage of progress, useful or useless, the authorized limit of the cost of it has been reached. Such is the logical result from the decision in 14 Allen (*supra*). It was there held that the words of the act, in that case, authorizing the " issue of scrip to an amount not exceeding in the whole " a sum named, was a limit to that amount of the permanent and municipal debt which could be made ; but that it was not a limit on the whole cost of the work, for there was open to the city the means of temporary loans or local taxation. Had the words been there, as they are here, " the whole amount *to be paid* shall not exceed $8,000,000," would not a parity of reason have made that sum a limit to which expenditure could run ? And would not that be a limit upon actual cost, whatever might be the cost to which plans resting in contemplation would run, if completed ? (*Hasbrouck* v. *Milwaukee*, 13 Wis., 37.) Let me make an illustration : If I should say to one, I make you my agent ; go buy for me a steamship, and you may give my notes for the price ; I put no limit on the price that he

may give, or on the amount of the notes he may make. If I say to him, buy for me a steamship, yet the whole sum to be given for her must not exceed $800,000, and to that amount you may issue my notes; there is clearly a bound beyond which he may not go. Nor is the case different, when I give the authority to buy to one agent, with power to call on another agent for the means of payment. Nor is it an impossibility, either in law or in fact, to put a limit on the expense, where the cost of the project is not to be exactly ascertained at the start. Though it be problematical and contingent, it is my right, and it is in my power, by the use of words, to hold my agent within a limit. Thus, I may say to an agent, build me a steamship, of such tonnage and power, but it must not cost more than a sum named. He is bound to keep in mind the limit I have fixed. If he reaches it, and the work is not done, he may not go on. What is his position as to liability to me for having improvidently begun, when he could not reasonably expect to finish, it is not needful here to say. What is his liability to others, with whom he has made contracts beyond the means promised to him, has been decided by this court in *Paulding* v. *Cooper*,[*] not yet reported. If a natural person may put such a limit upon delegated power, there is no reason why any other giver of power may not do so. It is then a question of the meaning of the phrases used in giving it. When we turn to section three of the act of May 14, 1875, we see that the pith of it is to confer authority upon the two cities to build the bridge, and to issue their bonds to raise the means to meet the expense, but with a limit upon that expense which need not be more succinctly or more plainly expressed than in the language of the act; "provided, however, that the whole amount to be paid by both shall not exceed $8,000,000." The amount which they have power to pay must be the amount to which they may go in expenditure; and the amount to which they may go in expenditure is the amount which the work may cost. Though the plans may have been made so large, by design, or ignorance, or mistake,

[*] 74 N. Y., 619.

as to be too great for the sum authorized, that does not warrant going on, when the limit has been reached to which expenditure may run.   The work must stop ; and it is for the source of power to consider what shall then be done. In my judgment, when the Legislature had passed the act of 1875, it, for the time being, had done with the matter.   The bridge was not a State work, like the Erie canal or the State capitol, which the State was doing, and for which the Legislature was making and to make appropriations, from time to time.   It was a local municipal work, as to which the Legislature had no more at that time to say than to give permission to do it, and with power to affix conditions to the permission.   So that the considerations which are urged, drawn from the nature of a public work involving much expenditure, and much time to do, and needing only appropriations from year to year of comparatively limited amount, are not in place here.   Those considerations are appropriate where the Legislature is the one agent of the public, whose function it is to direct the work and raise the means, and there are other agents of the public, whose function it is to devise the plan, and to do the work and lay out the money.   But here are two corporate entities, with no power to enter upon a project conceived to be of municipal utility, who come as petitioners to the Legislature, which may give or withhold, and may affix conditions and limits.   The Legislature gives to them power to build, power to pay for the building, and power to raise the money in a certain way.   It is a single grant of power to single entities.   The actors, who are to use each branch of the power, are the same.   In using each branch of it, they can go no further than the bound of the power given ; and that bound is upon the whole power and upon each branch of it. It is plain, I think, that the two cities are in a different position from that above indicated, of separate agents of the general public.   Nor, in my judgment, is the case like that in 6 McLean (*supra*).   There a county was authorized to do a work.   As well as can be gathered from the opinion in the

case and the head-note, (for there is no statement of facts)·
an issue of bonds to the amount of $200,000 was authorized,·
and no other means of payment were provided for.    But
there were no words of restriction, as there are here.    It was
held that the specification of the amount to which bonds
were to be issued was not an implied limitation upon
the cost of the work.    One argument used is, that in
all public works, either by Federal or State governments,
it is not usual to appropriate, when the work will require
several years for its completion, more than a small part
of the necessary expenditure (at once, I suppose, is to
be understood), as any other course, especially when the
money must be borrowed, would be wasteful.    It· will
be seen, at once, that this reasoning does not apply to
this case.    For here it is expressly said, that the whole
amount to be paid shall not exceed $8,000,000.    Besides, the
" wasteful expenditure " likely to arise from a single appro-
priation in gross, is guarded against by a limit upon the
amount which shall be paid in each year, to wit : $1,000,000
by one city, and $2,000,000 by the other ; and by the pro-
vision that the interest on all bonds issued shall be counted ·
as part of the gross sum of $8,000,000.    Then the words
here, " the whole amount to be paid shall not exceed," is a
limit on what may be paid, put upon the two cities ; and as
the two cities, and no other person or body, is to build and
to pay, is it not a limit upon the right to incur a liability
to pay, which is the same as a limit upon what the work
may cost ?    That is to say, it is a prohibition upon doing·
more work than that sum will pay for ; which is a limit
upon actual cost, for there can be no further cost, without
the intervention of the Legislature giving further power to
raise and pay money.

I think too that the history of this enterprise, as shown
in legislation, indicates forcibly that it was the purpose of
the Legislature to set up a bound of cost.    It was started
as a private enterprise, doubtless with the notion, at first, of
private gain therefrom.    The amount of the capital stock

is, it is true, not the limit to which a corporation may go, in the purchase or expenditure for property. Yet, when persons ask of the Legislature a charter for a purpose, the sum at which they name the capital is an indication to the law makers of what is then thought to be enough to set the corporation going and making profits. The corporation started with a named capital of five millions of dollars, but with the not unusual power to increase. The project looked so feasible and so fruitful, at that sum, that though the privilege was given to the two cities of taking the work from the private corporators, it was upon conditions that the property should be paid for by the cities, at cost and at a premium of $33\frac{1}{3}$ per cent in addition, and that the bridge be made free. The cities were permitted to become stockholders, but with no provision for a voice in the management. That provision was made two years after, when, as we may infer, the work began to look too large for private means; and then the requirement was made that the bridge be built by June 1, 1874. It was not then done; but on the fifth of that month, an act was passed to amend the original act, and " to provide for the *speedy construction of the bridge;* " and from it, it is apparent that need was felt of public aid. *For the purpose of completing it,* the two cities were authorized to subscribe three millions, in proportions named. The use of this phrase, *for the purpose of completing it,* connected with the amount named, is significant. Here was an indication of the legislative conception, at that time, of what money was needed to complete the bridge, and of the sum which the Legislature would permit the two cities to pay therefor. And as further indication of a purpose to limit the amount, was the singular provision that the interest of the bonds issued under the act should form part of the cost, and should be deducted from the amount of payment. I can but regard this peculiar provision as significant of a purpose to restrict the municipal expenditure to the sum named and expressly warranted by the Legislature. In May 14, 1875, came the act more

immediately· before us, when the purpose of building the bridge by private enterprise seems to have been given up as too large for private hands, and the Legislature was asked to permit the two cities to become the only builders and owners of it. I think that we can see, from its previous guarded action, as shown in the statutes passed, that the Legislature was not willing to put the cities upon a work of unrestricted cost, and that the proviso already quoted is charged with more meaning and intensity, from the previous legislative action. I think too that these repeated applications to the Legislature, for new and varied enactments, made it plain to the law-maker that the cost of the work would be liable to run beyond first expectation, and that, for the safety of the cities, there should be set up a bound, beyond which expenditure and liability should not go, without renewed legislative permission. There is too the provision above alluded to, and repeated in this act, that the interest upon all bonds issued by the two cities should be charged as part of the construction, and be withheld from the annual payments. If the purpose was to have the cities build, whatever it might cost to carry out the plan, or if the purpose was to have the bridge built, whatever might be the cost, where the good or saving of this provision? Of what avail to withhold an amount equal to the interest, and to make it part of the cost, unless it was to keep the cost from going beyond the limit of $8,000,000, the amount of the principal sum, for which bonds could be issued? If the cost might go beyond that sum, it would have to be made up in principal of bonds, or by taxation, or other way of raising money. This provision is certainly significant of the purpose to fix a limit to the cost of the work. There may have been the purpose also to compel the diligent prosecution of the work, and the speedy raising of the money upon the bonds called for and issued, and the prompt disbursement of it in the work. But a chief design would seem to be, that the cities should not lay out upon the bridge more than the sum named as the limit of the principal of the

bonds they might issue ; and as by the provisions of this act, none but the two cities could lay out money upon it, it was effectual that the cost of the bridge could not go beyond that sum.

It is said, that the Legislature provided by the act that the bridge should be a public work ; and should be constructed by the two cities, for the accommodation, convenience, and safe travel of the inhabitants of the district. It is argued thence, that the chief idea in the legislative mind was the finishing of the work in a manner safe and sufficient ; and that the cost of doing it was a minor consideration. I do not think that we can justly say that. The constitution enjoins upon the Legislature, that it shall restrict in cities the power of taxation, contracting debts, and loaning their credit ; Const. art. VIII, § 9. Can we properly attribute to legislative action, in a particular case, that in framing a statute to meet it, it lost sight of, or seeing, was careless of its general constitutional duty ? For my part, I had rather come to the interpretation of a legislative act with a sense of the existence of this constitutional injunction, and with a feeling that the law maker acted in the presence of it. Besides, I cannot agree that, in looking at a law providing for work that will cost money, to be raised finally by taxation, it is the proper judicial mood, to assume or to concede that the Legislature was not prudent and forecasting, and had no thought of the burden it was about to lay upon the people. It would not be wise or honest, for it so to do. It would be reckless and improvident. Hence, when words of restriction are found in a statute authorizing a work, costly at the best, they are not to be narrowed in their reach, by the assumption that the Legislature looked only at the utility of the work when done, but to have a liberal and broad operation, and to be applied to all parts of the act which may fairly fall within their force, upon the other assumption that the Legislature will not carelessly delegate the power to burden the people with debt, but will, as prudent agents, count the cost. So when I read the act, by

which it is declared that the bridge is to be constructed in the manner above indicated, and that the expense thereof shall be defrayed by the two cities; and I find it further declared, that *for such purpose* they may be called on for yearly payments, but that the whole amount shall not exceed $8,000,000; I am unable to repel the conviction that the Legislature meant that the two cities should carry out "such purpose" by the expenditure of not more than that sum; and that the amount named is a limit upon "such purpose," as well as upon the liability of the two cities to pay for "such purpose." I think that the language of the act, in its restrictive words, applies to all that goes before them in the section in which they occur, and that the "expense of constructing," etc., is as well limited by them as the amount to be paid by the municipalities, which alone can lawfully construct it. The purpose is to construct the bridge; for that purpose the two cities may pay a fixed sum, and no more; as no one else may pay, how is more to be paid; and if no more can be paid, how can the work cost more? It cannot cost more, until the Legislature is again appealed to and again gives power to raise and expend money.

It is said, that the Legislature contemplated a finished bridge. So, indeed, it did. It is argued therefrom, that it meant not to fix a limit to the cost of finishing it. It did not contemplate an unfinished bridge. It looked for a finished bridge, at the expenditure of the sum named; otherwise the proviso of limitation was useless. When, then, it gave the power to the two cities to finish it, and limited the exercise of that power within an expenditure of $8,000,000, did it not contemplate that that sum would finish and must finish it; especially when the sum is named, not in the manner of making an annual or recurring appropriation, but as a gross sum to be spread over years of progress in the work, to be called for as needed, and so that waste may not take place by accumulation of idle funds, and from interest on bonds. The Legislature never contemplated an unfinished

bridge ; and yet this will be the result with the law as it now stands. As it contemplated a finished bridge, and forbid further payment to that end than the sum named, it contemplated a bridge finished with that sum. We cannot speculate upon the future action of the Legislature. It may, or may not, provide for the finishing the bridge, after the $8,000,000 are expended. This court is to construe the legislative action only as it is. That action will produce only an unfinished structure, which was clearly never intended. It is for the Legislature, and not the courts, to determine whether a more expensive structure shall be made. From the language of the act, then, and from the intent of the Legislature, as gathered from the successive acts upon this subject, I am of the opinion that it was the legislative purpose to fix a limit to the cost of the bridge.

And now to practically apply the result of this discussion.

It is conceded that the contemplated cost of the bridge will exceed, by a considerable sum, the $8,000,000. So that, if the defendant pays the million called for, his principal, the city of New York, will not have a completed bridge. And if the views above expressed are correct, it never will have, until the Legislature shall be again appealed to, and shall again give permission to pay more. Is it not, then, the duty of all concerned to stop, until that permission be obtained, if it may be ? It is contingent whether it will be. While contingent, it seems the part of financial wisdom to put no more money into a work which may be of so much more useless cost. Is it not, then, within the bounds of a just and proper exercise of discretion, for the defendant to refuse to issue further bonds of his municipal principal ? At any rate, is it not proper for a court to decline to issue its discretionary writ of mandamus to compel him to do that which is, to say the least, of doubtful expediency ?

As these considerations have brought me to the conclusion that the *mandamus* should not have issued, I am for a reversal of the order of the General Term, and for an affirmance

of that of the Special Term, without passing upon the other serious questions presented by the appellant.

Rapallo, Andrews and Danforth, JJ., concur with Earl, J.

Church, Ch. J., and Miller, J., concur with Folger, J.
Judgment affirmed.