PATRICK WALSH, Appellant, *v.* THE TRUSTEES OF THE NEW YORK AND BROOKLYN BRIDGE, Respondents.

While express words of incorporation are not essential to create a corporation, but one may arise without such words out of the general language of a statute, if a corporation is necessary to accomplish the purpose of the act, where no such necessity exists, it may not be held that a corporation is created by implication.

Accordingly *held*, that as the purpose of the act of 1875 (Chap. 300, Laws of 1875), in reference to the New York and Brooklyn bridge, was to extinguish the then existing corporation, and vest all its property in the two cities, and as all the purposes of the act could be carried out without the creation of a corporation, the board of trustees, whose appointment is provided for by said act, were not to be considered as a cor-

poration, but as merely agents for and representatives of the two cities, and as such they were entitled to all the immunities of public agents; that, therefore, an action to recover damages resulting from the negligence of a laborer engaged in the construction of the bridge was not maintainable either against " the trustees of the New York and Brooklyn bridge " as a corporation, or against the trustees individually.

*It seems* that if responsibility for such negligence rests anywhere save upon the negligent employe, it is upon the two cities for whom the work was being done.

(Argued June 9, 1884; decided October 7, 1884.)

APPEAL from judgment of the General Term of the Supreme Court, in the second judicial department, entered upon an order made December 12, 1883, which affirmed a judgment in favor of the defendants, entered upon an order sustaining a demurrer to the complaint herein.

The nature of the action is stated in the opinion.

*Charles J. Patterson* for appellant.    Incorporation can be implied from the powers conferred upon a body of men, and no precise form of words is necessary for that purpose.    (Angell & Ames on Corp., § 145; *People* v. *Kelly,* 76 N. Y. 475; *Conservators of Tone. R.* v. *Ash,* 10 B. & C. 349; *Ex parte Newport Trustees,* 16 Sim. 346.)    Treating the defendants as incorporated trustees charged with the duty of constructing and maintaining the bridge from public funds, and privileged to exact tolls for its use for public purposes, they are liable for the cause of action stated in the complaint.    (*Mersey Docks* v. *Gibbs,* 11 H. of L. 686; *Scott* v. *Manchester,* 2 H. & N. 204; *Bailey* v. *Mayor,* 3 Hill, 531; *Hand* v. *Brookline,* 126 Mass. 324; *Cowley* v. *Sunderland,* 6 H. & N. 204; *Aldrich* v. *Tripp,* 11 R. I. 141; *Hill* v. *Boston,* Mass. 344; *Childs* v. *Boston,* 4 Allen, 41; *White* v. *Hindley, Local Board,* L. R., 10 Q. B. 219.)    Defendants' liability for negligence in constructing the bridge is on precisely the same footing as their liability for not keeping it in repair after its completion. (*Hutson* v. *Mayor,* 9 N. Y. 169, 170.)    The exemption of counties and towns from liability for non-repair of public highways, even where the duty to repair was cast upon them by law,

never depended on their *quasi* corporate character, and it never extended to a case where the town or county in respect to a particular work derived an emolument or advantage, or otherwise held a similar situation to that of a private proprietor. (*Hand* v. *Brookline,* 126 Mass. 324; *Hannon* v. *St. Louis County,* 62 Mo. 313; *Sims* v. *Butler County,* 49 Ala. 110; *Scales* v. *Chattahoochee County,* 41 Ga. 225.) The true criterion which is at the base of all the decisions respecting public corporate liability for negligence is the question whether the work in which the negligence occurs is performed in the capacity of governmental agency or of private proprietorship. (*Maximilian* v. *Mayor,* 62 N. Y. 160; *Mower* v. *Leicester,* 9 Mass. 247; *Brady* v. *Lowell,* 3 Cush. 121; *Hill* v. *Boston,* 122 Mass. 344; *Morgan* v. *Hallowell,* 57 Me. 375–378; *Jones* v. *New Haven,* 34 Conn. 1–13; *Hewson* v. *New Haven,* 37 id. 475; *Freeholders* v. *Strader,* 18 N. J. L. 108; *Pray* v. *Jersey City,* 32 id. 394; *Detroit* v. *Blackby,* 21 Mich. 84; *Winbegler* v. *Los Angelos,* 45 Cal. 36; *Dean* v. *New Milford,* 5 W. & S. 545; *Rapho* v. *Moore,* 68 Penn. St. 404; *Mahoney* v. *Scollay,* 84 id. 136; *Newlin* v. *Davis,* 77 id. 317; *Chandler* v. *Fremont,* 42 Iowa, 58; *Nelson* v. *Jefferson,* 13 id. 181; *Duckett* v. *Ann Arundel County,* 20 Md. 468; *Jackson* v. *Greene County,* 76 N. C. 282; Dillon on Mun. Corp., §§ 15, 23; *Robinson* v. *Chamberlain,* 34 N. Y. 389; *Hover* v. *Barkhoof,* 44 id. 113; *Hill* v. *Boston,* 122 Mass. 344; 1 Thompson on Negligence, 3 H. N. 308; *Whitehouse* v. *Fellows,* 10 C. B. 765; *Brownlow* v. *M. B'd,* 13 C. B. [N. S.] 768; 16 id. 546; *Mirch* v. *Conservator of Thames,* L. R., 7 C. P. 458; *Southampton* v. *S. L. B'd, etc.,* El. & Bl. 801, 812.) The bridge is a municipal work. (*People* v. *Kelly,* 76 N. Y. 487; *Donovan* v. *B'd of Education,* 85 id. 117; 62 id. 160.) Although the cities are not liable they must pay the trustees any damages recovered against them. (76 N. Y. 475.)

*W. N. Dykman* for respondent. The trustees of the New York and Brooklyn bridge are not a corporation. (*Gardner* v. *B'd of Health of N. Y.,* 10 N. Y. 409; *Appleton* v. *Water*

*Comm'rs of N. Y.*, 2 Hill, 432 ; *Stebbins* v. *Jennings*, 10
Pick. 172 ; 1 Dillon on Mun. Corp. [3d ed.], § 43 ; *Gardner*
v. *B'd of Health*, 10 N. Y. 409 ; *Water Comm'rs of N. Y.*,
2 Hill, 432 ; *Comm'rs of Emigration*, 28 N. Y. 134 ; *Over-seers of the Poor and County Loan Comm'rs*, 1 Cow. 260 ;
2 Blacks. Com. 431 ; *Murphy* v. *Comm'rs of Emigration*, 28
N. Y. 134 ; *Matter of Rochester Water Comm'rs*, 66 id. 413 ;
*Miller* v. *Mayor, etc.*, 13 Blatch. 469 ; *De Zeng* v. *Beekman*,
2 Hill, 489.) The trustees defendant are public officers and
are not liable as individuals for the negligence of their subor-
dinates. (Laws of 1875, chap. 300, § 6 ; *Donovan* v. *Mc-Alpin*, 85 N. Y. 185 ; *Lorillard* v. *Town of Monroe*, 11 id.
392 ; *De Zeng* v. *Beekman*, 2 Hill, 489 ; *Lane* v. *Cotton*, 12
Mod. 488 ; *Whitfield* v. *Le Despencer*, Cowper, 765 ; *Nicholson*
v. *Mounsey*, 15 East, 384.) The trustees are not liable in any
*quasi* corporate capacity. (*Ensign* v. *Supervisors of Living-ston County*, 25 Hun, 20 ; Laws of 1875, chap. 300 ; *People,
ex rel. Murphy*, v. *Kelly*, 76 N. Y. 475, 484 ; Laws of 1857,
chap. 569, § 1 ; *Morey* v. *Town of Newfane*, 8 Barb. 645 ;
*Lorillard* v. *Town of Monroe*, 11 N. Y. 392 ; *Alamango* v.
*Supervisors*, 25 Hun, 551 ; *Ensign* v. *Supervisors*, id. 20 ;
*Mower* v. *Leicester*, 9 Mass. 247 ; *Ham* v. *Mayor, etc., of N.
Y.*, 70 N. Y. 459 ; *Maximilian* v. *The Mayor*, 62 id. 160 ;
*Hill* v. *City of Boston*, 122 Mass. 344 ; *Smith* v. *City of
Rochester*, 76 N. Y. 506 ; *N. Y. & B. Lumber Co.* v. *Brook-lyn*, 71 id. 580 ; *McKay* v. *Buffalo*, 9 Hun, 401 ; 74 N. Y.
610 ; *Murphy* v. *Comm'rs of Emigration*, 28 id. 134 ; *Finch*
v. *B'd of Education of N. Y.*, 85 id. 117 ; *B'd of Comm'rs*
v. *Mighels*, 7 Ohio St. 109 ; *B'd of Freeholders of Sussex* v.
*Strader*, 18 N. J. L. Rep. 108 ; *Riddle* v. *Proprietors of
Locks and Canals*, 7 Mass. 187 ; Dillon on Mun. Corp. [3d
ed.], §§ 996, 999 ; [2d. ed.], § 785 ; Burrill's Law Dict., title
" Trinoda Necessitas ;" 1 Sharswood's Blk. Com. 263 ; *Hill*
v. *Supervisors*, 12 N. Y. 57 ; 1 R. S. 524, § 119 ; *People* v.
*Supervisors*, 1 Hill, 50 ; *Ensign* v. *Supervisors of Livingston
County*, 25 Hun, 20 ; *People* v. *Kelly*, 76 N. Y. 475, 495.)
When a duty is imposed on a municipal corporation for the

benefit of the public without any consideration or emolument received by the corporation, it is only where the duty is a new one, and such as is ordinarily performed by a trading corporation, that an intention to give a private action for a neglect in the performance is to be presumed. (*Hill* v. *Boston*, 122 Mass. 344; *Almango* v. *Supervisors*, 25 Hun, 551; *Ensign* v. *Supervisors of Livingston*, id. 20.)

EARL, J. While the New York and Brooklyn bridge was being constructed, a laborer employed thereon carelessly let a plank fall from the suspended structure which struck and injured the plaintiff who was at the time passing upon a street within the city of New York, and he brought this action to recover for his injuries. The defendant demurred to the complaint on the ground that it did not state facts sufficient to constitute a cause of action, and it had judgment upon the demurrer which was affirmed at the General Term.

The theory of the complaint is that the defendant is a corporation and that the laborer was in its employ, and that it was responsible for his carelessness as his superior, and it is only upon this theory that the action can be maintained.

We are of opinion that the bridge trustees were either agents of the State or agents of the two cities of New York and Brooklyn for the construction of the bridge, and hence that they were not the legal superiors of the laborer and were responsible only for their own personal misconduct or negligence.

The first act for the construction of the bridge was the act, chapter 399 of the Laws of 1867, which created a body corporate by the name of "the New York Bridge Company. The corporation was to have a board of trustees, and a capital stock divided into shares. It was provided in the act that the two cities might, upon the terms mentioned, at any time, take the bridge and acquire all the property therein. If the bridge had been built by that corporation and the power had been exercised in behalf of the two cities, the corporation would, *ex necessitate*, have ceased to exist, and the bridge would have

been a free bridge maintainable by the two cities as the owners thereof. The act also provided that the two cities could subscribe for, and take shares of the capital stock, or guarantee the bonds of the corporation, and this power was to some extent exercised by subscriptions to the stock.

That act was amended by the act, chapter 26 of the Laws of 1869, which authorized each of the two cities to be represented in virtue of the stock held by it by three of its officers in the board of directors of the corporation, the other directors to be chosen by the other stockholders.

The act of 1867 was again amended by the act, chapter 601 of the Laws of 1874. The first section provided that when the two cities should accept the provisions of the third section of the act, and when the owners of two-thirds of the private stock of the corporation should accept the provisions of the second section, the board of directors of the corporation should consist of twenty members to be appointed as follows : Eight by the mayor and comptroller of each city ; and such mayors and comptrollers were to be *ex officio* members of the board. Section two provided that whenever any private stockholder should give his assent as therein mentioned, the directors might, on behalf of the two cities, purchase his stock ; and section three declared the bridge to be a public highway between the two cities, subject to tolls, and authorized the two cities to subscribe for additional stock. That act left the corporation still existing with the two cities and the private stockholders owning and holding all the stock. But before any subscriptions to the stock were made under that act by the two cities, the constitutional amendments took effect January 1, 1875, section 11 of article 8 of which provides as follows: "No county, city, town or village shall hereafter give any money or property, or loan its credit to, or in aid of any individual, association or corporation, or become directly or indirectly the owners of stock in or lands of any association or corporation; nor shall such county, city, town or village be allowed to incur any indebtedness, except for county, city, town or village purposes." It therefore became necessary to destroy the bridge corporation

before the two cities could make any further contributions to
the construction of the bridge, and for that purpose the act,
chapter 300 of the Laws of 1875, was passed. That act is
entitled "An act providing that the bridge in the course of
construction over the East river, between the cities of New
York and Brooklyn, by the New York Bridge Company, shall
be a public work of the cities of New York and Brook-
lyn, and for the dissolution of said company, and the com-
pletion and management of the said bridge by the said cities."
Section one provides that whenever two-thirds of the private
stock of the corporation shall have been retired by the pur-
chase of the same, as provided in the act of 1874, the corpora-
tion shall be dissolved, and the debts and liabilities of the same
shall be paid by the trustees of the bridge, and the bridge shall
be completed and managed in behalf of the two cities as a con-
solidated district. Section two provides that the mayor, comp-
troller and president of the board of aldermen of the city of
New York shall appoint eight persons, and the mayor, comp-
troller and city auditor of the city of Brooklyn shall appoint
eight persons as trustees, and that the persons so appointed,
together with the mayors and comptrollers of the two cities
shall constitute the board of trustees of the bridge, and shall
have full power, control and direction over the plan and con-
struction thereof; that the trustees so appointed shall hold
office for two years, and all vacancies happening by the expi-
ration of any term or otherwise shall be filled by appointment
in the same way. Section three provides that from and after
the dissolution of the corporation, the bridge shall be a public
work to be constructed by the two cities for the accommodation,
convenience and safe travel of the inhabitants thereof, and that
the expense of constructing and maintaining the same, and ac-
quiring the land necessary therefor, and all liabilities imposed
upon the two cities, or incurred by them by virtue of the act, shall
be defrayed by them in the proportion of two-thirds parts by
the city of Brooklyn and one-third part by the city of New
York, the money to be provided by the two cities upon calls

made by the trustees.  Section four provides that on the completion of the bridge the income derived from the same shall be applied toward the payment of the principal and interest of all bonds issued by the two cities for the bridge, in proportion to the amount issued by the cities respectively.  Section five provides that the trustees shall have power " to purchase, acquire and hold " for the two cities conjointly as much real estate as may be necessary for the purposes of the bridge, to make and establish ordinances and laws regulating the use of the bridge, under reasonable penalties to be recovered in their behalf and in their name by the title of " The Trustees of the New York and Brooklyn Bridge," to keep and maintain the bridge in good and proper condition, and in case of injury or damage thereto, to repair and restore the same; and that for that purpose the two cities shall provide and pay them the necessary means in the proportions mentioned.  Section six provides that the trustees shall have power to make needful rules and by-laws for the government of their board; to appoint one of their number president, and also a secretary and treasurer, and such other officers and subordinates as may be necessary for the performance of their duties, and to fix their compensation; that until otherwise determined by the trustees, the officers of the corporation at the time of the dissolution thereof shall be the officers of the board of trustees; and that they shall present a monthly statement of their receipts and expenditures to the mayors of the two cities.  Section ten provides that in case the trustees shall be unable to acquire the necessary real estate by purchase, they shall have the right to acquire the same by proceedings in the exercise of the right of eminent domain, and that the title thus acquired shall vest in the two cities in the shares mentioned; that no action or proceeding by or against the New York Bridge Company shall abate or terminate by the dissolution of the corporation, but that the court may substitute the trustees as a party to such action or proceeding; that all property or assets of the corporation at the time of its dissolution shall remain liable for the debts and obligations of the company, and that any proceed-

ings by the corporation to acquire real estate pending at its dissolution, may be prosecuted by the trustees to a final determination, and the title acquired thereby shall vest in the two cities as before provided. Section 11 provides that in case any private stockholder of the bridge corporation shall have declined to sell his stock as provided in section 2 of the act of 1874, the trustees shall proceed at once to acquire the same for and on behalf of the two cities in the manner provided in the preceding section for the taking of real estate. Section 12 provides that upon the dissolution of the bridge corporation as provided in the act, the bridge and all its appurtenances, and all the property and effects connected therewith, shall vest absolutely in the two cities, in shares to each of the cities equal to the amount paid, and to be paid by them for the construction of the bridge and the land and appurtenances thereof.

It will be seen by this analysis of the act of 1875, that the bridge corporation was utterly wiped out ; that was the main purpose of the act. (*People, ex rel. Murphy,* v. *Kelly*, 76 N.Y. 475.) Provision was made for divesting the corporation of all its property, and vesting it in the two cities, not in the bridge trustees. There can be no pretense that there is any language in the act expressly creating a new corporation to take the place of the one dissolved. After the dissolution of the bridge corporation, and the acquisition of all its property, and the interest of all its stockholders on behalf of the two cities, there remained no longer any stock, or any shares of stock, or any fixed capital, or any stockholders. The two cities became the conjoint owners of all the bridge property as the proprietors thereof in certain proportions. There could have been no intention on the part of the legislature to create a new corporation. If there had been an intention to use a corporation for the construction of the bridge, it would not have been necessary to utterly destroy the existing corporation. That could have been so moulded as to suit the new purposes. Such an intention might have defeated the purposes of the act in view of the constitutional amendment then recently adopted. That absolutely prohibits the two cities from giving money or loaning

credit to any corporation whatever. Without now determining that the legislature could not have created a private corporation with authority to build this bridge for the sole benefit of the two cities, with money to be furnished solely by them, it is believed, from the language of the act, that the projectors and promoters of the bridge, who procured its passage, meant to avoid the risk of a collision with the Constitution by the creation of a corporation to build and maintain the bridge with the funds and credit of the two cities. Nor, in view of that constitutional provision, should we hold that a corporation was created by implication, and thus bring the act under the possible condemnation of the Constitution. Express words of incorporation need not be used to create a corporation. One may arise without express words of creation out of the general language used in an act where a corporation is necessary to accomplish the purpose of the act. Here a corporation was not needed to accomplish any of the purposes of the act of 1875. It was not needed to take and hold the bridge property, as that was all vested in the two cities. It was not needed to take and hold the real estate to be acquired for the bridge as that was all to be vested in the same way. Every purpose of the act could be accomplished by the trustees acting for and on behalf of the two cities as their representatives and agents, the cities furnishing all the corporate capacity needed to hold and perpetuate indefinitely the bridge and the property and franchises connected therewith.

The language in section 5 of the act, which empowers the trustees "to purchase, acquire, and hold" for the two cities real estate, did not authorize them to take the title to the real estate in their own names as trustees. They were to purchase and acquire the title on behalf of the two cities and in their names, and to hold it as trustees for them. Other parts of the act, if this were doubtful, make it plain. All the real estate owned by the bridge corporation at the time of its dissolution, and all that should be acquired by hostile proceedings under section 10, were in terms vested in the two cities; and it could not have been the legislative intention that a portion of the

real estate should be vested in the trustees and a portion in the cities.

The authority conferred upon the trustees by section 5, to sue for penalties in the aggregate name of "the trustees of the New York and Brooklyn bridge," and the authority under section 10 to substitute the trustees as a party to any action pending for or against the corporation, do not show a legislative intention to create a corporation nor raise one by implication. The legislature could have authorized the same actions and proceedings to be maintained in the name of the president of the board of trustees, or in the name of any other officer or agent of the cities, or of either of them. All that was mere matter of convenience. It is not uncommon for statutes to endow administrative boards which are organized for public purposes, and are mere public agents, with capacity to sue and be sued by an aggregate name. The name in which these trustees were authorized to sue was not given to them as a corporate name. They were not a self-perpetuating body; they owned no property, and whatever money they should recover for penalties or receive from any source, and whatever personal property should at any time be in their possession, they would be obliged to hold and administer for the benefit of the two cities for the precise purposes mentioned in the act. They represented and acted for the two cities as their agents just as the water commissioners represented the city of New York in the cases of *Appleton* v. *Water Commissioners* (2 Hill, 432) and *Bailey* v. *Mayor, etc.* (3 id. 531, and 2 Denio, 433); as the board of public works represented the District of Columbia in the case of *Barnes* v. *District of Columbia* (91 U. S. 540); as the Rochester water commissioners represented the city of Rochester in 66 N. Y. 413, and as the park commissioners represented the city of New York in the case of *Ehrgott* v. *Mayor,** recently decided by us. In all the cases mentioned the commissioners and boards had powers quite as absolute and independent as those possessed by these trustees,

* *Ante*, p. 264

and yet they were held to be mere agents of the municipalities which they represented.

In *Ex parte Newport Marsh Trustees* (16 Sim. 346),the trustees were held to be a corporation by implication because a corporation was necessary for the purposes of the act of Parliament creating them. In the *Mersey Docks Cases* (11 H. of L. Cas. 687), " the Mersey Docks and Harbor Board" was expressly created a corporation by act of Parliament.

The litigation in the case of *Miller* v. *Mayor, etc.* (13 Blatchf. 469; 109 U. S. 385), and that in the case of *People, ex rel. Murphy,*v. *Kelly* (76 N. Y. 475), were conducted through all their stages without the presence as a party of " the Trustees of the New York and Brooklyn Bridge," as a corporation, and yet if there was such a corporation, its presence as a party was necessary to a proper determination of those cases. In the latter case it was said : " The act of 1875 is not, as claimed by the appellant, in conflict with the constitutional provision above recited. It was not the purpose or effect of the act to make the city of New York a stockholder in the bridge company, or to cause it to loan any money or credit to such company, It was the purpose of the act to extinguish the company, and vest all its property in the two cities for a public purpose."

So far the discussion has proceeded without noticing the fact that the complaint alleges that the defendant is a domestic corporation, and if that is to be taken as a pure allegation of fact, then it is admitted by the demurrer. But such effect has not been claimed for the allegation on the argument before us. We must take notice of the public acts authorizing the construction of the bridge, and those acts may be read as if embodied in the complaint, and then the allegation that the defendant is a corporation is a mere conclusion of law not admitted by the demurrer. We must look at the acts to see whether it is a corporation or not, and we have reached the conclusion, for the reasons which we have given, that it is not.

It follows that no judgment could in this action be rendered against " the trustees of the New York and Brooklyn bridge " as a corporation. But we do not rest our judgment upon this

narrow basis. Even if the defendant could be held to represent the trustees with the same force and effect as if they had been sued as trustees in their own names, the same result would follow. The trustees are mere representatives and agents, and not the legal superiors of the laborer who caused the accident. They are entitled to all the immunities of public agents charged with a duty which from its nature could not be exercised without availing themselves of the services of others; and the doctrine of *respondeat superior* does not apply to such cases. They are no more responsible for the negligence of laborers employed by them than the commissioner of public works, or the commissioners of the Central park in the city of New York would be responsible for the negligence of laborers employed by them in the discharge of the multifarious duties devolved upon them as municipal agents.

Who then is responsible to the plaintiff for his injuries? This question we need not answer at this time. We will simply say that if responsibility for them rests anywhere but upon the laborer whose carelessness caused them, it rests upon the two cities for whom the work upon which the laborer was engaged was being done. Whether they were his legal superiors, and thus responsible for his negligence, we do not at this time determine, as they have not appeared in this action, and no argument has been made on their behalf.

The judgment should be affirmed, with costs.

All concur.

Judgment affirmed.