(32 App. Div. 513.)

PEOPLE ex rel. BAIRD v. NIXON et al.

(Supreme Court, Appellate Division, Second Department. July 23, 1898.)

GREATER NEW YORK—BRIDGE COMMISSIONERS—REMOVAL.

By virtue of section 95 of the Greater New York charter (Laws 1897, c. 378), the mayor of the consolidated city was empowered to remove from office the commissioners of the proposed bridge over the East river, who were appointed, respectively, by the mayors of the former cities of New York and Brooklyn, under Laws 1895, c. 789, and to appoint their successors.

Action by the people, on the relation of Andrew D. Baird and others, against Lewis Nixon and others. Finding for plaintiffs. Motion of defendants for a new trial on exceptions ordered to be heard in the first instance by the appellate division. Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Henry C. M. Ingraham, for plaintiffs.

Almet F. Jenks (George Hill, on brief), for defendants.

CULLEN, J.   On May 27, 1895, an act was passed for the construction of a permanent suspension bridge over the East river, between the cities of New York and Brooklyn. Laws 1895, c. 789. By this statute the mayors of the cities of New York and Brooklyn were each to severally appoint three persons, who, with the mayors, were constituted a commission for the purpose of constructing the bridge. The relators were appointed as such commissioners. On January 19, 1898, the mayor of the present city of New York removed the relators, and appointed the defendants commissioners in their stead. This is an action of quo warranto to oust the defendants and restore the relators to the offices formerly held by them.

The only question involved in this controversy is the power of the mayor to remove the relators. By section 95 of the Greater New York charter (chapter 378, Laws 1897), it is provided: "At any time within six months after the commencement of his term of office, the mayor, elected for a full term, may, whenever in his judgment the public interests shall so require, remove from office any public officer holding office by appointment from the mayor." That the relators were public officers cannot well be denied. People v. Nostrand, 46 N. Y. 375. This court is committed to the doctrine that the mayor of the present city of New York is the successor of the mayor of that city as formerly constituted, and also of the mayor of the city of Brooklyn. Carey v. Wurster (Sup.) 52 N. Y. Supp. 160; People v. Feitnor (Sup.) 51 N. Y. Supp. 1094. The latter case was affirmed by the court of appeals (156 N. Y. ——, 51 N. E. ——) on the opinion of this court, delivered by Mr. Justice Goodrich. It therefore follows that the relators fell within the words of the statute, and that the mayor was authorized to remove them, unless it can be established that by fair intendment this legislation was not meant to cover their cases. The language being comprehensive, the burden is on those who assert the exception to prove it.

The first ground on which the claim of the plaintiffs proceeds is that the construction of the bridge was a work of the state, and the relators were state agents. Even were this proposition admitted, under the Feitnor Case it would not help the plaintiffs. It was there said by Judge Goodrich, speaking of the power conferred on the mayor by the section of the charter quoted: "It is broad enough to authorize the mayor to remove any officer appointed by any public official to whose powers he succeeded." We see but little foundation for the claim that the relators are state agents. It may be assumed that the state might itself have constructed the bridge as a public work of the state, and for its account, and for that purpose

have appointed its own officers or agents. The question is not what the legislature might have done, but what it has done by the statutes relative to this bridge. It directed that the bridge should be built at the sole cost of the two municipalities (since consolidated into one) which it was to connect. For the purpose of defraying this cost the municipalities were directed to issue their bonds. The commissioners who were to devise the plan and superintend the construction of the bridge (with the exception of the mayors themselves) were to be appointed by the mayors of the two cities. The mayors would be chosen from time to time by the electors of the two municipalities. By the constitutional amendment of 1875 (section 10, art. 8) neither city could incur any indebtedness, except for a city purpose. Bearing in mind these facts, we think it reasonably clear that the construction of this bridge was a municipal work of the two cities, prosecuted on their behalf by municipal officers. Fortunately, we are relieved from extended discussion of the question by a number of decisions of the court of appeals, rendered in litigations arising out of the New York and Brooklyn Bridge, on the legislation as to which bridge that concerning the new bridge has largely been modeled. In People v. Kelly, 76 N. Y. 475, it was held that to bridge the East river between New York and Brooklyn was a city purpose of each city. In Walsh v. Trustees, 96 N. Y. 427, it was held that the trustees of the bridge were mere representatives and agents, and not the legal masters of the laborer who caused the injury to the plaintiff, and that against them no action would lie; the court, however, declining to express an opinion as to upon what body the ultimate responsibility lay. But the same plaintiff having subsequently brought his action against the two cities (Walsh v. Mayor, etc., 107 N. Y. 220, 13 N. E. 911), it was held that the defendants were responsible. In that case Judge Earl wrote:

"The two cities, in the proportions mentioned in the act, were to furnish all the funds for the construction of the bridge. The trustees of the bridge were to be appointed by the city officials of the two cities. All the real estate purchased by the trustees was to belong to the two cities jointly, and the bridge and all its appurtenances, and all the property connected with it, was to belong absolutely to the two cities, in shares to each of the cities equal to the amount paid by them for the construction of the bridge and for the land and appurtenances thereof. * * * So, in every sense and in every view, the bridge was constructed and is managed for the two cities. and the trustees appointed by the city officials represent the two cities as their agents. Hence they, and the persons employed by them, are the agents and servants of the cities, for whose careless and negligent acts they are liable."

After the decision in the Walsh Case, the legislature enacted, by chapter 128, Laws 1891, that thereafter neither of the two cities should be liable for claims or demands growing out of the bridge, but that the trustees of the bridge should succeed to the liabilities of the two cities, whether on contracts or for wrongs, actions for which should be prosecuted against the trustees in their corporate name, and all damages and judgments should be paid out of the money received by them for tolls and rents. When this legislation relieved the cities of New York and Brooklyn from immediate liability on account of the bridge, the trustees did not cease to be municipal officers or agents. True, the statute changed the rule of re-

spondeat superior as to employés of the bridge. We suppose that the legislature might abrogate the rule of law which renders the master liable for the negligence of his servants in the case of all persons, whether natural or artificial. If it should so change the law, servants and agents would remain servants and agents still. The rule of respondeat superior, as relating to municipal corporations, has at all times been the subject of technical distinctions and legal fictions. Thus, two cities are liable for the negligence of their employés in the construction of a bridge built by them (Walsh v. Mayor, etc., supra), while two counties are not (Markey v. County of Queens, 154 N. Y. 675, 49 N. E. 71). No substantial distinction can be drawn between the relations sustained by the trustees of the New York and Brooklyn Bridge to the two cities and those which the relators bore to those cities. Everything said by Judge Earl as to the ownership of the bridge and the land on which the same is to stand, the furnishing of the funds for its construction, and the appointment of its managers by the municipal officers is equally true of the case of these relators.

The learned counsel for the plaintiffs has cited a number of authorities to the effect that certain local officers, in the discharge of their official duties, do not act as the agents or servants of the localities or municipalities for which they are elected or appointed, but exercise part of the governmental functions of the state. Lorillard v. Town of Monroe, 11 N. Y. 392; Maxmilian v. Mayor, etc., 62 N. Y. 160; Ham v. Mayor, 70 N. Y. 459; New York & B. Sawmill & Lumber Co. v. City of Brooklyn, 71 N. Y. 580. We do not see that this principle or the decided cases make in favor of the plaintiffs; rather the reverse. In Lorillard v. Town of Monroe it was held that the town was not liable for the act of the assessor. In Maxmilian v. Mayor it was held that the commissioners of public charities in the city of New York did not discharge corporate or municipal duties, and that the city was not liable for an injury occasioned by one of their employés. In Ham v. Mayor the same rule was held to apply to the case of an injury caused by an employé of the board of education of that city. The same rule doubtless applies as to the responsibility of the city for the torts of its police or fire department; yet the mayor is given by the charter the power to remove and appoint the heads of all these departments, except the members of the board of education, which the legislature thought necessary to exempt in terms. In People v. Andrews, 104 N. Y. 570, 12 N. E. 274, it was contended that commissioners of excise did not fall within the provisions of the statute (chapter 43, Laws 1884) that "all appointments to office in the city of New York, now made by the mayor and confirmed by the board of aldermen, shall after that time be made by the mayor without such confirmation," on the ground that the excise commissioners were state, not municipal, officers. Of this Judge Danforth said:

"While, therefore, they may be in one sense, and that a technical one, state officers, their dependence upon the city and its municipal government is manifest, and we see no reason to suppose that they are not within the purview of the statute under which the defendants were appointed. They are within its letter, and the body of the act is not restrained by its title. It

is 'An act to center responsibility in the municipal government of the city of New York.' "

This would seem equally applicable to the offices of the relators.

It is asserted for the plaintiffs that the relators were appointed, not as ordinary city officials, to discharge continuous governmental duties, and to perform part of a permanent scheme for the government of either municipality, but to construct and complete a particular improvement, and that their official term was to endure for the period requisite for the construction of that improvement. It is argued that these facts take the offices of the relators without the intent and contemplation of the legislature in the enactment of the charter. This argument would have much greater force were it not for the amendatory act of 1896 (chapter 612). By the original act of 1895, the commissioners were simply to construct the bridge, and turn it over when constructed to the trustees of New York and Brooklyn Bridge for management and control. By the act of 1896, the commissioner, instead of transferring the bridge after its completion to the trustees of the other bridge, were themselves vested with its care, management, and control. The two statutes cannot be considered as creating two independent offices, that of a commissioner pending construction and that of a commissioner after construction; but from the time of the enactment of the amendatory statute, taken together, they must be construed as having created a permanent, continuous board of trustees for the construction, operation, control, and management of the bridge. As the legislature has not in express terms declared the tenure of the office of such a commissioner to be during life, it would seem to fall within the provisions of section 3, art. 10, of the constitution: "When the duration of any office is not provided by this constitution, it may be declared by law, and if not so declared, such office shall be held during the pleasure of the authority making the appointment." People v. Comptroller, 20 Wend. 595. But assuming that the constitutional provision does not apply, or that the legislature has made the term of the office during life, that would not take the office without the scheme of removal provided for by the charter. Under the charter, the term of each police commissioner is to be four years, the term of one commissioner to expire every year; the term of the president of the board of public improvements is six years; that of the commissioners of parks, six years; the terms of the commissioners of buildings, of the commissioners of public charities, of the commissioners of correction, the fire commissioner, and of the commissioners of docks are the same,—yet all these officers are subject to removal every four years by the incoming mayor during the first six months of the latter's term. We see no greater inconsistency in subjecting the official terms of the relators, even if those terms were for life, to the power of removal given to the mayor, than there is in the case of the official terms of the other officers mentioned.

On the whole, we are of the opinion that not only did the terms of the charter confer upon the mayor the power to remove the relators and appoint their successors, but that the general scheme of municipal government inaugurated by that charter contemplated the

possession by the mayor of such a power. As was said by Judge Goodrich in the Feitnor Case, supra:

"It [section 95, Greater New York Charter] was also intended to confer upon a new mayor the right of removal of any officer appointed by his predecessor, so that the responsibility of the new administration should rest upon him and his appointees, or upon such of the appointees of old incumbents as he desired to retain in office."

This intention is manifest by section 118 of the charter. By that section the mayor is authorized to appoint all members of any local boards and all other officers not elected by the people, whose appointment is not excepted or otherwise provided for. Ordinarily, the construction of bridges over a stream intersecting the territory of a city is devolved on some branch of the municipal government of the city. When this bridge was originally inaugurated, the cities of New York and Brooklyn were separate municipalities, and each city was fairly chargeable with its portion of the expense of the work. Because the municipalities were separate, it was necessary that special legislation should provide for their joint action, and for the appointment of new officers, who were to conduct the work on behalf of both. But when the cities became consolidated there was no reason why the officers charged with the duty of constructing the bridge should be any less dependent on the executive head of the city, or less subject to his control, than the other departments of the municipality. Under the new charter the mayor can appoint the heads of all the departments, and, having uncontrolled power of selection in such appointments, he can justly be held responsible by the people for the conduct of all branches of the city government. We see no reason to believe that it was not the legislative intent to apply the same rule to the construction of this bridge as to the prosecution of other city improvements or to other municipal expenditures.

It is attempted to distinguish the case of the relator Baird from those of the other relators because Col. Baird is a veteran of the late war. We have so recently reviewed the statutes giving the veterans preference or immunity from removal that we do not think it necessary to go over the subject again. People v. England, 16 App. Div. 97, 45 N. Y. Supp. 12; People v. Gray (not yet officially reported) 51 N. Y. Supp. 1087. We are of opinion that the office held by Col. Baird is not of the subordinate character which comes within the protection afforded by the veteran acts.

The judgment appealed from should be reversed, and judgment directed for the defendants, with costs. All concur.