Pauline Salzman, Plaintiff, *v.* Vincent R. Impellitteri, as Mayor of the City of New York, et al., Defendants, and Nathaniel L. Goldstein, as Attorney-General of the State of New York, Intervener, Defendant.

Supreme Court, Special Term, New York County, April 20, 1953.

490

*Herman Katz* for plaintiff.

*Denis M. Hurley, Corporation Counsel (W. Bernard Richland, Pauline K. Berger* and *Barbara Carroll* of counsel), for Vincent R. Impellitteri, as Mayor, and another, defendants.

*Nathaniel L. Goldstein, Attorney-General (Wendell P. Brown* and *Ruth Kessler Toch* of counsel), intervener, defendant.

SCHREIBER, J. The amended complaint in this taxpayer's action, brought pursuant to section 51 of the General Municipal Law, seeks a declaratory judgment to the effect that chapters 200–208, inclusive, of the Laws of 1953 are unconstitutional. The plaintiff has made a motion for a temporary injunction restraining the Mayor and the board of estimate of the City of New York, defendants in the action, from exercising the right given to the Mayor by chapters 200 and 201 to appoint some of the members of the New York City Transit Authority, created by those chapters, and from entering into an agreement, authorized by said chapters, with the newly created transit authority for the transfer of the city's rapid transit facilities to the authority.

The city's answer seeks a declaration that chapters 201–205, inclusive, are unconstitutional, or, in the alternative, that chapters 200 and 201 are unconstitutional and that the conditions attached to chapters 202, 203, 204, 205 and 208 are also unconstitutional. By consent of the plaintiff and of the Mayor and the board of estimate, the Attorney-General of the State of New York has been permitted to intervene as a party defendant. In the Attorney-General's answer to the original complaint, which attacked the constitutionality only of chapters 200 and 201, the position was taken that those statutes are constitutional. In his answer to the amended complaint the Attorney-General asks that chapters 200 to 208, inclusive, be declared constitutional. The Attorney-General has moved to dismiss the amended complaint on the ground that there is no justiciable controversy between the parties since, according to the Attorney-General, the City of New York does not intend to avail itself of the provisions of the sections sought to be declared unconstitutional.

On the assumption that the amended complaint of the plaintiff will be dismissed, the Attorney-General moves (1) to vacate the order permitting him to intervene, (2) to withdraw his answers, and (3) to dismiss the cross demand against him contained in the city's answer in which judgment is sought declaring various statutes unconstitutional. In the event that the complaint is not dismissed, the Attorney-General seeks judgment declaring chapters 200–208 constitutional.

The amended complaint alleges that the Mayor and the City of New York are about to avail themselves of the provisions of chapters 200 and 201 of the Laws of 1953 and to appoint members of the transit authority as well as arrange for the conveyance of the city's transit lines to the authority. The answer of the Attorney-General denies this allegation and it is on the assumption that the allegation is untrue that he makes the claim that there is no justiciable controversy between the parties. However, for the purposes of the Attorney-General's motion, the court is obliged to assume that the allegation of the amended complaint is true and that the city authorities do intend to avail themselves of the recently adopted transit acts in the event that they are held to be constitutional. The answer of the Mayor and the board of estimate does not deny the plaintiff's allegation that they intend to avail themselves of the provisions of the transit acts and is entirely silent on the subject. In the present state of the pleadings, therefore, the court may not assume that the Attorney-General is correct in his claim that the city authorities do not intend to avail themselves of the new legislation. It follows that a justiciable controversy does exist.

Since the pleadings of the plaintiff and of the city present for determination the constitutionality of the various legislative acts referred to, the Attorney-General, who is a defendant as a result of his own application, may not, as he seeks to do, prevent a determination of these questions on the technical ground urged by him that the city had no right to serve a cross demand upon him, without his prior consent, seeking a declaration as to the constitutionality of the various statutes. It is unnecessary, in these circumstances, to consider the validity of the Attorney-General's contention that the city could not legally serve a cross demand upon him, without his consent, for, even if the cross demand be disregarded, the amended complaint and the city's answer thereto (not to mention the answer of the Attorney-General thereto) sufficiently present for deter-

mination all the issues embodied in the city's cross demand against the Attorney-General.

The various motions now before the court thus require it to determine whether chapters 200, 201, 202, 203, 204, 205 and 208 of the Laws of 1953 are unconstitutional in whole or in part.

Chapters 200 and 201 (adding and amdg. Public Authorities Law, art. 7, tit. 15, §§ 1800 through 1821) create a "New York City Transit Authority" for the purpose of acquiring and operating the facilities now operated by the board of transportation of the City of New York. Two of the members are to be appointed by the Governor and two by the Mayor. The fifth is to be selected by the other four members. If for any reason the fifth has not been appointed or has not qualified by May 1, 1953, the chairman of the Port of New York Authority or a member of that authority is to be the fifth. The statutes authorize, *but do not compel,* the City of New York to enter into an agreement with the transit authority for the transfer to the latter of the city's transit facilities. Various terms of the agreement are specifically prescribed by the Legislature and others are left to be negotiated between the city and the authority. Unless the city voluntarily enters into the agreement authorized by the acts in question, the transit authority will not be able to acquire or operate the city's transit facilities.

Chapters 202 and 203 of the Laws of 1953 authorize the City of New York to impose a payroll tax upon salaries received for work performed in the city of New York. Chapters 204 and 205 of the Laws of 1953 authorize the city to increase the real estate tax rate above the rate presently permitted. Chapter 208 of the Laws of 1953 authorizes the city to issue serial bonds in a prescribed maximum amount to provide for the city's pension contribution on behalf of transit employees during the fiscal years 1951–1952. Chapters 202, 203, 204, 205 and 208 contain provisions making them operative and effective only if the City of New York should transfer its transit facilities to the transit authority prior to July 1, 1953.

The questions presented for adjudication are purely legal questions of constitutional law. No factual disputes are involved. The question of the desirability or wisdom of the laws attacked as unconstitutional is not germane to a determination of the legal issues here presented. The question whether the city authorities should or should not avail themselves of the provisions of some or all of the sections in question is not a proper concern of the court on the present motions. The only questions

which are submitted for decision are whether the various acts assailed as unconstitutional do or do not violate various provisions of the State Constitution.

The city's first contention is that the so-called Transit Authority Act (Public Authorities Law, art. 7, tit. 15, §§ 1800 through 1821, as added and amd. by L. 1953, chs. 200, 201) violates section 1 of article VIII of the State Constitution, which reads: " No * * * city, * * * shall give or loan any money or property to or in aid of any individual, or private corporation or association, or private undertaking * * * ; nor shall any * * * city * * * give or loan its credit to or in aid of any individual, or public or private corporation or association, or private undertaking ".

The act authorizes the city to enter into an agreement with the transit authority for the transfer to the latter of the city's transit facilities. One of the terms of the agreement is that (L. 1953, ch. 201, § 4, subd. 1, par. b) "Such agreement shall provide that capital costs of a nature not heretofore charged as operating expenses shall be paid by the city, or at the option of the authority may be paid in the first instance by the authority but in such event, the authority shall be entitled to recover from the city the amount of such costs; provided, however, that the liabilities so incurred during any fiscal year shall not exceed the average of all expenditures for similar purposes during each of the five preceding fiscal years of the city, except with the prior approval of the board of estimate. Where the city is required to reimburse the authority for the amount of any capital costs pursuant to such agreement, serial bonds or capital notes may be issued by the city, pursuant to the local finance law, to finance any such reimbursement in the same manner and to the same extent as if such costs were to be paid directly by the city."

The city states that the average expended on capital costs during the last five fiscal years of the city was over $44,000,000 per year and that the agreement prescribed by the statute thus mandates upon the city the obligation to incur indebtedness for transit capital improvements in the sum of $44,000,000 per year for at least ten years, the minimum term of the agreement under the statute. According to the city, it could not enter into the statutory agreement without violating the provision of section 1 of article VIII that no city shall " give or loan its credit to or in aid of any * * * public corporation ".

It is clear that this provision of the Constitution does not prohibit the city from agreeing to pay the capital costs if no giving or loaning of credit (i.e., no borrowing) by the city is involved. Not only does the provision relied upon by the city employ the words " give or loan its *credit* " (italics the court's) but the language immediately preceding that relied upon by the city, dealing with transactions between a city and a *private* corporation or association, uses the much broader phraseology that " no * * * city * * * shall *give or loan any money or property* to or in aid of any. * * * private corporation or association, or private undertaking". (Italics supplied.) Thus a city is forbidden, in the case of a *private* corporation, to " give or loan any *money or property* ", but in the case of a *public* corporation it is forbidden only to " give or loan its *credit.*" (Italics supplied.) This distinction between gifts or loans *of money or property* and gifts or loans of *credit* is emphasized in *Union Free School Dist. No. 3* v. *Town of Rye,* (280 N. Y. 469), where the Court of Appeals said (p. 474): " There is here a clear distinction in the scope of the restriction, placed by the Constitution upon a unit of local government in the administration of its finances, between a gift or loan of the *money* or *property* of such a unit and a gift or loan of its *credit.* [Italics in original.] Public moneys should be used for public purposes; therefore, gifts or loans of public money or property may not be made to an individual or *private* [italics in original] corporation or association or private undertaking, *but there is no prohibition against gifts of moneys to a public corporation for a public purpose, at least where the local unit does not borrow the money so given or loaned.* Unwise use of local public moneys even for a public purpose may cause hardship to the taxpayer but correction of error there is left by the Constitution to the people whose money is used and who select the local officials." (Italics this court's.)

The city in its brief correctly states that the constitutional provision relied upon by it merely " prohibits a city from *borrowing* money in aid of a public corporation " (italics the court's). The Transit Authority Act, although it *permits* the city to issue serial bonds or capital notes to raise funds with which to reimburse the authority for capital costs incurred by the latter, *does not compel or require* the city to do so. If the city should choose to avail itself of the provisions of the Transit Authority Law and enter into an agreement with the authority for the transfer of its transit facilities to the latter, it may validly do so under the act, if it reimburses the capital

costs to the authority from the city's revenues and assets without borrowing funds to do so. That the city could validly agree to pay the capital costs incurred by the transit authority if it is under no compulsion to " give or loan its credit ", i.e., to borrow, is not open to question. (*Union Free School Dist. No. 3* v. *Town of Rye, supra; Matter of Bronx Parkway Comm.* v. *Hylan,* 119 Misc. 785, affd. 206 App. Div. 688, affd. 236 N. Y. 593.) Assuming, for the moment, that the provision of chapter 201 of the Laws of 1953 which authorizes the city to issue serial bonds or capital notes in order to obtain funds with which to reimburse the transit authority is unconstitutional as a gift or loan of the city's *credit* to or in aid of a public corporation, the city could, should it elect to do so, waive this privilege, intended solely for its benefit, and agree to reimburse the authority without resorting to the issuance of bonds or notes or other means of borrowing funds. This is particularly true in view of the provision of section 1820 of the Transit Authority Act that " If any section, clause or provision of this title shall be unconstitutional or be ineffective in whole or in part, to the extent that it is not unconstitutional or ineffective, it shall be valid and effective and no other section, clause or provision shall on account thereof be deemed invalid or ineffective."

We turn now to the question whether the provision which permits the city to meet the authority's charges for capital costs by the issuance of serial bonds or capital notes is unconstitutional. Would the borrowing of money by the city to pay the cost of the capital improvements made by the authority constitute a gift or loan of its credit in aid of a public corporation within the meaning and intent of section 1 of article VIII of the Constitution? Section 1819 of the Public Authorities Law (as amd. by L. 1953, ch. 201, § 8), provides that " Upon the termination of the agreement of transfer provided for in section eighteen hundred three of this title or of any renewal thereof, all the rights and properties of the authority shall pass to the city and the city shall succeed to the rights, powers, duties and obligations of the authority." Section 1803 (added by L. 1953, ch. 200) fixes the term of the agreement at " not * * * less than ten years." Section 1806 (as amd. by L. 1953, ch. 201, § 7) provides for a sale of the city's omnibus facilities by July 1, 1955, *and the payment of the proceeds thereof to the city*. It is thus clear that regardless of the form or nature of the documents which may be agreed upon by the city and the authority for the transfer of the transit facilities from the former to the latter, the essential nature of the transaction is a temporary transfer for

a term of years with a reversion to the city. If the city should refuse to agree to a term exceeding ten years and should elect not to renew at the end of that period, the transit lines would revert to the city at the expiration of the ten-year term. If the original term agreed upon should exceed ten years, or if there should be one or more voluntary renewals, the transit properties would go back to the city more than ten years later. The capital costs incurred by the authority during the period of its possession and control of the transit facilities would enhance the value of the transit properties which the city would get back at the end of the original or renewed term. The expenditures for capital costs during the time the authority controlled and operated the transit facilities would be at the same rate as the expenditures for capital costs made by the city during the latter's last five fiscal years, unless the board of estimate should authorize greater expenditures (§ 1803, subd. 1, par. b). The purpose of the transit authority is not to make money but only to operate the city's transit facilities " on a basis which will enable the operations thereof, exclusive of capital costs, to be self-sustaining " (§ 1802, subd. 1).

In these circumstances, funds borrowed by the city for the purpose of reimbursing the authority for the capital costs incurred by the latter are actually and in substance being borrowed for the city's own benefit, since the transit authority's possession and control would be that of a quasi-lessee or trustee acting on behalf of and for the benefit of the city.

An analogous situation was presented in *Sun Print. & Pub. Assn.* v. *Mayor* (152 N. Y. 257, 270). In that case a railway was to be built at the expense of New York City. The Legislature had authorized the rapid transit commissioners to contract for the leasing and operation of the railway to private interests for not less than thirty-five nor more than fifty years, with a right to renew from time to time. The railway was to be the property of the city. The contention was made that a bond issue to meet the expense of building the road was unconstitutional as a violation of section 10 of article VIII of the then Constitution (now art. VIII, § 1) because (p. 270) " the bonds issued by the city for construction would, in effect, be a loan of the credit of the city to the parties leasing the road ". The Court of Appeals overruled this claim and upheld the validity of the bond issue. The court said (pp. 269–270) : " The acts in question, under a fair construction, do not require the city to loan its credit to or in aid of any individual, association or corporation. It is provided that in case the road shall be con-

structed by and at the city's expense, then and in that event the road so constructed shall be and remain the absolute property of the city, so that whatever the municipality expends in the construction of the road is for the creation of its own property and is not in any sense a loan to an individual or corporation. It is said, however, that there is a provision for a lease of the road for a period not less than thirty-five nor more than fifty years and for successive renewals thereof; that a lease in perpetuity would be equivalent to ownership, and that the bonds issued by the city for construction would, in effect, be a loan of the credit of the city to the parties leasing the road; but such a construction would manifestly be violative of its spirit and intent. It would be in conflict with the express provision that the road should be and remain the absolute property of the city. It would not be in accord with the provision limiting the terms for which a lease may be made ".

The express statutory provision in chapter 201 of the Laws of 1953, for reverter to the city at the end of the original or any renewed term is substantially equivalent to the provision in the cited case that the railway was to belong to the city.

In *Matter of Bronx Parkway Comm.* v. *Hylan* (119 Misc. 785, affd. 206 App. Div. 688, affd. 236 N. Y. 593, *supra*), the Special Term used language pertinent here (pp. 786–787) : " The objection that the Bronx river parkway is not a city purpose for which indebtedness may be lawfully incurred under article VIII, section 10, of the Constitution, I think is met by the answers given by the Court of Appeals to the same objection raised at the time of the construction of the Brooklyn bridge and of the acquisition of Pelham Bay parkway. Both of those projects involved the expenditure of money outside of the then limits of the city of New York, but the geographical feature was held not to be an obstacle. *People ex rel. Murphy* v. *Kelly*, 76 N. Y. 475; *Matter Appl'n. Mayor, etc., of City of N. Y.*, 99 id. 569. See, also, *Sweet* v. *City of Syracuse*, 129 N. Y. 316; *Matter of Town of Saratoga*, 160 App. Div. 60. The defendants seek to distinguish these cases on the ground that the fee of the property there acquired vested in the city. No reasoning is advanced to support this distinction. The title of all of the city's property, generally speaking, is vested in it in trust for public use; that is to say, for the purpose for which the property is acquired, and as long as the purposes of the trust are permissible, the individuality or identity of the trustee holding the legal title would seem comparatively unimportant. As a matter of fact, it appears from the opinion in *People ex rel. Murphy* v. *Kelly*,

*supra,* that the title to the land acquired for the Brooklyn bridge was to be taken in the first instance by the bridge trustees. So in the present case, while the title of all lands is by section 10 of the act to be taken in the name of the Bronx parkway commission in fee, nothing in the act is to be taken or held to affect or abridge the right of the city to perform its lawful functions of government within the boundaries of the parkway. § 5, as amd. by Laws of 1922, chap. 604.''

Borrowing by the city to enable the authority while in *temporary* possession and control of the city's transit facilities, to meet capital costs incurred in maintaining and improving the city's properties is not the type of borrowing which the Constitution intended to prohibit. It was only borrowing by a local unit for the benefit of another, *without benefit to itself,* which the Constitution sought to forbid. This was made clear in the opinion of the Court of Appeals in *Union Free School Dist. No. 3* v. *Town of Rye* (280 N. Y. 469, *supra*) where Judge LEHMAN, writing for the court, said (p. 474): '' The entire machinery of local government may, however, break down if the credit of the units of local government required to carry out their governmental functions is impaired, and there may be danger of such impairment if a local unit is permitted to give or loan its credit or to borrow money *in aid of undertakings outside of its own field.* [Italics supplied.] To safeguard that credit the Constitution permitted the use of its credit by a local unit *only for the purposes of that unit,* [italics supplied] and prohibits it from giving or loaning its *credit* to or in aid of any ' *public or private* corporation ' ''. (Italics in original.) That it was only borrowing which was not for the benefit of the borrowing local unit which was barred by the Constitution is made clear in the same opinion (pp. 477–478): '' The representatives of the People in convention assembled, doubtless viewed with concern the possibility that, if a local unit, unable to raise by taxation or by use of its credit all the moneys it desired to expend for its local governmental purposes, were permitted to rush to another local unit with better credit or to the State and to induce the loan of sound credit to bolster up its own failing credit, the entire financial structure of the State might be weakened. To safeguard the public credit against such a threat, section 1 of article VIII was formulated for the protection of the finance of local units, and similar provision made in article VII to protect the finances of the State.''

Since the borrowing of funds by the city to meet the authority's capital costs would not be for the benefit of another public corporation, without benefit to the city, but rather for the benefit of the city itself, the authority being in mere temporary possession and control, it follows that such borrowing would not violate section 1 of article VIII of the Constitution.

It is also urged that the creation of the transit authority violates section 3 of article VIII of the Constitution, which provides that "No municipal or other corporation * * * possessing the power (a) to contract indebtedness *and* (b) to levy taxes or benefit assessments upon real estate or to require the levy of such taxes or assessments, shall hereafter be established or created". (Italics the court's.) The city recognizes that the purpose of this provision "is to restrict the *joint* power to borrow and to tax to the normal governmental subdivisions, the municipalities" (City's Brief, p. 20 — italics the court's). Although the authority, under section 1807 of the new statute, is given the power to "issue notes in anticipation of the receipt of revenues" and to sell the notes at public or private sale, it is not given the power to levy or to require the levy of taxes or assessments on real estate. It rests entirely with the city as to how it is to obtain funds with which to pay the authority moneys due from the city to the authority. Nowhere is the authority given the power to levy taxes or assessments or to compel the city to do so. The city may, if it so elects, raise the funds necessary to discharge its obligations to the authority by taxes or measures which do not involve real estate taxes or assessments. Although some provisions of the Rapid Transit Law which have been continued in force by the Transit Authority Act permit the transit authority in certain cases to require the levy of assessments upon real property (see, especially Rapid Transit Law, § 34, subd. c), this requires the joint action of the authority and the board of estimate, which must give its approval. It is thus clear that the power to require the city to levy assessments does not reside in the transit authority even in the cases governed by these provisions of the Rapid Transit Law, for the power is of no force or effect without the action and approval of the city. Actually, it is the city which is to decide whether or not to comply with the request of the authority and it follows that the authority does not possess the power to require the levy of assessments within the meaning of section 3 of article VIII of the Constitution.

The city also claims that the Transit Authority Act violates the provision of section 5 of article X of the Constitution that "Neither the state nor any political subdivision thereof shall at any time be liable for the payment of any obligations issued by such a public corporation heretofore or hereafter created, nor may the legislature accept, authorize acceptance of or impose such liability upon the state or any political subdivision thereof". The court can see no merit in this claim. There is no provision in the statute, or in the agreement authorized by the statute, which would render the city liable for the payment of obligations issued by the authority. The only obligations which the authority is authorized to issue are notes "in anticipation of the receipt of revenues," to "be repaid from revenues received" (Transit Authority Act, § 1807). The incurring of debts for capital costs, which the city may be required by the authority to pay, is not the issuing of obligations within the meaning of section 5 of article X.

It is also urged that the agreement between the transit authority and the city, provided for in the Transit Authority Act, would, *if the term of the agreement should exceed ten years,* cause the city to exceed the constitutional limits upon its power to incur debts. As of July 1, 1952, the amount of debt which the city was free to incur under section 4 of article VIII of the Constitution was approximately $46,000,000 and its debt-incurring margin under subdivision E of section 7 of article VIII, was approximately $500,000,000. The agreement provided for by the Transit Authority Act, as previously stated, would require the city to pay more than $44,000,000 per year either directly to the transit authority, or for the latter's account, to meet the capital costs to be incurred by the transit authority. The *minimum* term of the agreement is fixed at ten years. During this minimum period the city would thus be obligating itself for more than $440,000,000. Admittedly this would not exhaust the city's constitutional debt-incurring limit even if, as the city claims, "the total amount of. the indebtedness which might be mandated upon the City during the *entire term* of the contract constitutes an immediate 'indebtedness' of the City within the meaning of the * * * constitutional provisions upon the signing of the agreement. (*Levy* v. *McClellan,* 196 N. Y. 178.)" It is only if the term of the agreement entered into by the city with the transit authority should exceed the ten-year minimum prescribed by statute that the city might be incurring an indebtedness in excess of that authorized under the Constitution. Since the statute does not, by its terms, compel or require

the city to enter into an agreement for a period of more than ten years, the statute may not be held unconstitutional on the theory that the city, if it accepts and complies with the statute, will be required to exceed its constitutional debt-incurring limit. By limiting the term of any agreement it might make with the transit authority so that the term would not be long enough to produce a violation of the city's constitutional right to incur debts (the term would have to exceed twelve years to produce such violation), the city may comply with the Transit Authority Act without transgressing provisions of the Constitution limiting its power to incur indebtedness. As the Transit Authority Act does not make it mandatory upon the city to enter into an agreement which would cause a violation of its constitutional debt-incurring limit, the act is clearly not unconstitutional on the ground urged.

By chapters 202, 203, 204 and 205 of the Laws of 1953, the Legislature empowered the city to impose a payroll tax and to increase the real estate tax rate, but the privileges thus conferred were made conditional upon (1) the city's entering into an agreement, on or before June 1, 1953, with the transit authority created by chapters 200 and 201, for the transfer of the city's transit facilities to the authority, and (2) the completion of the transfer prior to July 1, 1953. Although some of the terms of the agreement have been specifically set forth in the Transit Authority Act (L. 1953, chs. 200, 201), others have been left for negotiation between the city and the authority. The city argues that the Legislature has thus conferred upon the transit authority, an appointive body, the discretion to decide whether or not the city shall obtain the tax relief given by chapters 202, 203, 204 and 205. It is true that the city and the authority may fail to reach an agreement because the terms insisted upon by the authority may be too onerous and exacting to permit the city to give them its approval. It is also true that if this should occur, the city would lose the right to increase the real estate tax rate and to impose a payroll tax. It does not follow, however, that the Legislature has therefore conferred upon the transit authority the right to grant or withhold the taxing power and that the Legislature has thus acted unconstitutionally. The city's conclusion that "there is vested in a non-legislative body * * * the power to call new taxes into existence" is not, in the court's opinion, a correct description, from a legal standpoint, of what has occurred. An illustration might serve to make this clearer. Suppose that a legislative act provided that the city of X could impose a payroll

tax only if it should be able to and should purchase the privately owned transit lines of the city for a sum not exceeding $5,000,-000. Such a statute would seem clearly to be valid and unobjectionable. Yet, if the city's present argument be accepted as meritorious, the statute in the hypothetical case would be invalid because it would place within the discretion of the officers of the private transit lines the granting or withholding of the right to impose the payroll tax — for if said officers should insist upon a price of more than $5,000,000, they could prevent the city from obtaining the right to levy the tax. In the court's opinion, the fact that failure of the transit authority to reach an agreement with the city may deprive the latter of the right to levy the payroll tax and to increase the real estate tax rate does not, from a legal standpoint, have the effect of rendering chapters 202 to 205, inclusive, unconstitutional as vesting the taxing power in an appointive body.

It is further argued that chapters 202 to 205, inclusive, of the Laws of 1953, relating to the payroll tax and the increase of the real estate tax rate, are unconstitutional because the annexation to those laws of a condition that the city enter into an agreement with the transit authority by June 1, 1953, and transfer its transit facilities pursuant to that agreement prior to July 1, 1953, constituted " an abuse of constitutional power to achieve an illegal purpose ". It seems clear that the Legislature was under no constitutional or other legal compulsion to authorize the city to impose a payroll tax and to increase the real estate tax rate. Being under no obligation whatsoever to confer these powers upon the city, it is difficult to perceive a good reason for denying to the Legislature the right to impose, as a condition of conferring rights which it did not have to grant, the requirement that they be given effect only if the city divest itself of its transit facilities and turn them over to a public authority. The city claims that the Legislature's right to restrict the power of taxation may be exercised under section 9 of article IX of the Constitution only " so as to prevent abuses in taxation and assessments ", and that what the Legislature did was not done for that purpose, but for a wholly unrelated purpose, described as the " illegal " purpose " to unlawfully deprive the City of its property without due process of law ". There are at least two answers to this claim. Firstly, chapters 202–205, inclusive, did not further restrict the city's taxing powers, but instead lifted existing restrictions upon those powers, though conditionally. In the second place, and more important, there is no proof whatsoever that the Legislature

was motivated by some improper purpose having no relation to the prevention of abuses in taxation and assessments. Without intending to indicate, even by implication, what the court's own views on the subject happen to be, the Legislature may well have been of the view that the city's ownership and operation of transit facilities had become so costly a proposition that it had resulted in abuses in taxation and assessments which the city had been obliged to resort to in order to continue its owner- ship and operation of the transit facilities. There is insuffi- cient basis, either in the record or in matters of which this court may take judicial notice, to warrant a finding that the Legislature, in attempting to obtain the city's consent to a trans- fer of ownership and operation of its transit lines to an inde- pendent public authority, did not act in good faith and in the honest belief that this solution of the transit problem was in the public interest and would tend to prevent some abuses of taxation and assessments.

Another attack upon the constitutionality of the Transit Authority Act is predicated upon the provision of the Consti- tution that " All city, town and village officers, whose election or appointment is not provided for by this constitution shall be elected *by the electors of such cities, towns and villages,* or of some division thereof, or appointed *by such authorities thereof,* as the legislature shall designate for that purpose " (art. IX, § 8; italics the court's). According to the city, this provision " inhibits the creation of an office having the inherent functions of an office held by local electors or authorities, if the new office is to be filled by appointment or election in which non-local authorities participate ". Since two of the mem- bers of the transit authority are to be appointed by the Gov- ernor and an additional member may be the chairman or a member of the Port of New York Authority, the city contends that the act violates section 8 of article IX. The city has neglected, however, to quote the sentence of that section which immediately follows the portion above quoted. That section reads: " All other officers, whose election or appointment is not provided for by this constitution, *and all officers, whose offices may hereafter be created by law,* shall be elected by the people *or appointed, as the legislature may direct."* (Italics the court's.) It is clear from this provision that the members of the transit authority, whose offices have been created since the enactment of the constitutional provision, may legally be appointed, instead of being elected, if the Legislature shall so direct (*Matter of McAneny* v. *Board of Estimate,* 232 N. Y.

377, 391). It has been held under this language that the Legislature had the right to say how the offices of special patrolmen in the board of transportation of New York City, a "city agency" (*Matter of Bacom* v. *Conway*, 294 N. Y. 245, 251) should be filled — the offices having been created after the effective date of the constitutional provision (*Matter of McKinnon* v. *Delaney*, 27 N. Y. S. 2d 713, affd. 263 App. Div. 986, affd. 289 N. Y. 656). It is accordingly unnecessary to consider whether the members of the transit authority, exercising a State function (*Sun Print. & Pub. Co.* v. *Mayor*, 152 N. Y. 257, *supra; Matter of Colbert* v. *Delaney*, 249 App. Div. 209) are "city * * * officers" within the meaning of the sentence from section 8 of article IX which the city has quoted and upon which it relies. (See *Matter of McAneny* v. *Board of Estimate, supra*, where transit commissioners were held not to be city officers.)

The claim is made that chapters 200 and 201 of the Laws of 1953, which establish the transit authority, violate the provisions of section 11 of article IX of the Constitution " in that they were not passed upon the request of the mayor of the City of New York concurred in by the New York City Council or upon the request of two-thirds of the elected members of the New York City Council, and were not passed upon the concurrent action of two-thirds of the members of each house of the legislature."

Section 11 of article IX of the Constitution provides that: " The legislature shall act *in relation to the property, affairs or government of any city* only by general laws which shall in terms and in effect apply alike to all cities, except upon the request of the mayor of the city affected concurred in by the local legislative body or upon the request of two-thirds of the elected members of the local legislative body declaring that a necessity exists and reciting the facts establishing such necessity and the concurrent action of two-thirds of the members of each house of the legislature. * * * The provisions of this *article* shall not be deemed to restrict the power of the legislature to enact laws relating to matters *other than the property, affairs or government of cities.*" (Italics supplied.)

Under section 12 of article IX every city, in addition to having the power to adopt and amend local laws not inconsistent with the Constitution and laws of the State " *relating to its property, affairs or government* * * * shall also have the power to adopt and amend local laws not inconsistent with this constitution and laws of the state, and *whether or not such local laws relate to its property, affairs or government,* in respect to the

following subjects: * * * *the ownership and operation of its transit facilities* ".

Under the above constitutional provisions, it is only as to laws in relation to " the property, affairs or government of any city " that the Legislature must comply with the requirements of section 11 of article IX, that a request be made by the Mayor or local legislative body for the legislation in question and that the legislation be passed by the concurrent action of two thirds of the members of each house of the Legislature. It is well settled that laws relating to rapid transit in a city do not relate to the " property, affairs or government of any city " within the meaning of the constitutional provisions above referred to.

In *Adler* v. *Deegan* (251 N. Y. 467, 472, 473), the Court of Appeals, in an opinion by Judge CRANE, pointed out that although rapid transit vitally touches the affairs of a city, laws relating thereto are adopted not only for the benefit of the city to be affected but for the public at large and therefore do not relate to " the property, affairs or government of any city " within the meaning of the home rule provisions of the State Constitution.

In *Matter of McAneny* v. *Board of Estimate* (232 N. Y. 377, *supra*) a statute relating to transit in the city of New York was held to have been constitutionally enacted notwithstanding the claim that it constituted an act of local legislation. The court said (p. 393) : " Rapid transit for the city of New York has, for many years, been a matter of public interest, affecting not only the people of that city, but of the whole state. It has been generally regarded as a state affair. The history of legislation on the subject shows it."

In *Admiral Realty Co.* v. *City of New York* (206 N. Y. 110), the opinion of Judge HISCOCK, writing for the Court of Appeals, contained the following language (p. 140) : " The latter contemplates laws which relate to municipal property and affairs and which may be described, as the provision does describe them, as ' city ' laws. To come within the precise provision which is invoked here it would be necessary to hold that the Rapid Transit Act was ' a special city law.' It seems to me that this term could not be regarded as a reasonable description of the statute before us. It was adopted not only for the benefit of the cities which, of course, would be affected, but of the public at large ".

In *Matter of Osborn* v. *Cohen* (272 N. Y. 55), dealing with the question of whether the home rule provisions of the State Constitution were violated, the court indicated that laws relat-

ing to transit did not require a request by the city or passage by two thirds of the members of each house of the Legislature (p. 59): " Transportation (*Admiral Realty Co.* v. *City of New York,* 206 N. Y. 110; *Matter of McAneny* v. *Board of Estimate,* 232 N. Y. 377) and widespread unemployment (*New York Steam Corp.* v. *City of New York,* 268 N. Y. 137), like health and education, have been, by custom, tradition and practice, considered as matters of State concern."

The fact that section 12 of article IX of the Constitution expressly authorizes a city to adopt local laws relating, *inter alia,* to " the ownership and operation of its transit facilities " does not have the effect of taking from the State Legislature its constitutional right to enact laws relating to rapid transit in cities. This is clear from the provision of section 11 of article IX that " The provisions of this *article* shall not be deemed to restrict the power of the legislature to enact laws relating to matters *other than the property, affairs or government of cities."* (Italics supplied.) The very provision of section 12 which confers upon the city the right to adopt local laws relating to the ownership and operation of its transit facilities is qualified by the language " whether or not such local laws relate to its property, affairs or government." Since laws relating to rapid transit in cities do not relate to the property, affairs or government of cities within the meaning of article IX of the Constitution, the right of the Legislature to enact statutes dealing with rapid transit in cities, without requests from the cities involved and without approval by two thirds of each house of the Legislature, seems clear beyond question.

The city maintains that whatever the law may have been prior to the adoption of a new Constitution in 1938, the amendments made in that Constitution had the effect of withdrawing from the State Legislature the right to enact special legislation for any city dealing with the subject of transit. It quotes a statement made by the 1938 Constitutional Convention reading: " The powers of cities to act in relation to their property, affairs and government are enlarged. Enactment of special State laws in that field is prohibited except at the request of the city affected " (N. Y. Const. Convention, 1938, Journal and Documents, Doc. No. 18, p. 5), and a dictum to the same effect in *New Rochelle Trust Co.* v. *White* (283 N. Y. 223, 229–230). The difficulty with the city's position is that the provisions of the Constitution adopted in 1938 are so clearly and unambiguously to the contrary that the wording of the Constitution itself must prevail. Had the Constitution, in giving cities the power

to enact various specified laws, including laws relating to " the ownership and operation of its transit facilities," provided expressly, or even impliedly, that those laws were henceforth to be considered as relating to the " property, affairs or government " of cities within the meaning of the Constitution, the conclusion would, of course, be required that the State Legislature could no longer, without a request by the city, enact any of the enumerated laws by special legislation. But the Constitution contains no such express provision and nothing from which one could be implied, for the grant of the power to a city to enact specified local laws is qualified in section 12 of article IX by the words " *whether or not* such local laws relate to its property, affairs or government," (italics supplied) thus indicating that the meaning of the words " property, affairs or government " as interpreted by numerous judicial decisions over a long period of years, was left untouched. Since section 11 of article IX of the Constitution adopted in 1938 expressly provides that " the provisions of this article [IX] shall not be deemed to restrict the power of the legislature to enact laws relating to matters other than the property, affairs or government of cities ", it is difficult to understand how these clear and unambiguous words of the Constitution itself can be ignored or disregarded and the view taken that after 1938 the Legislature no longer had the right to pass special laws in respect to the operation of transit in a city without complying with the requirements applicable to laws relating to the property, affairs or government of a city.

The view that the adoption of a new Constitution in 1938 did not have the effect of withdrawing from the Legislature its power to pass special laws relating to transit in cities was taken in an opinion of Attorney-General Bennett requested by the Speaker of the Assembly in January, 1942 (1942 Atty. Gen. pp. 316–318), and was followed in *Matter of Connolly* v. *Stand* (192 Misc. 872, affd. 274 App. Div. 877, affd. 298 N. Y. 658). The court at Special Term said (p. 875): " The further argument made that transit is now a matter exclusively of city concern, and not of State legislation, is fallacious. The State Legislature passed the City Home Rule Law in 1924 and amended it in its entirety in 1939. Since then it has frequently acted in matters of rapid transit affecting the city, the last amendment passed as recently as 1948, long after the adoption of the constitutional article and the City Home Rule Law. The decisions of our courts, both before and after the adoption of the home rule legislation, show clearly that the State Legislature is still empowered

to act in the premises (*Matter of Queens-Nassau Transit Lines, Inc.* v. *Maltbie,* 186 Misc. 494, affd. 271 App. Div. 81, affd. 296 N. Y. 893; *Wilmerding* v. *O'Dwyer,* 272 App. Div. 35, revd. on other grounds, 297 N. Y. 664; *Matter of Colbert* v. *Delaney,* 249 App. Div. 209, affd. 273 N. Y. 626).''

If the view were taken that the Legislature had lost the right after 1938 to enact statutes relating to the operation of transit in New York City without a request by the city and a two-thirds vote of the members of each house, the same conclusion would be necessary as to the power given to cities by section 12 of article IX to pass other local laws, such as laws relating to '' the hours of work or labor '' and laws relating to '' the protection of their [the inhabitants' of a city] property, safety and health.'' Only clear language to that effect could justify the construction that a State Legislature had been deprived of the right to pass special laws relating to matters which so clearly constitute State functions.

Attention is called to the fact that in *Matter of McAneny* v. *Board of Estimate* (232 N. Y. 377, 394, *supra*) three of the Judges of the Court of Appeals who concurred in the opinion reserved their judgment (p. 395) '' upon the question how far the rights of the city of New York in railroads which it owns, may be divested or modified under article 6 of the act until that article has been passed in conformity with article 12, section 2, [the then Home Rule article] of the Constitution of the state ''. If the Transit Authority Act compelled the City of New York to transfer its transit properties to the authority and thus divest it of its ownership of such properties without its consent, it might well be that the act would violate the home rule provisions of the Constitution. The fact is, however, that the Transit Authority Act does not compel or require the city to comply with its provisions and transfer its transit lines to the authority. The city is given the option to take advantage of the act and comply with its provisions or else refrain from availing itself of the provisions of the act. Since it is only if the city voluntarily enters into an agreement with the transit authority that it may be deprived of its ownership of the transit lines, it is clear that the act does not divest the city of its transit properties without its consent. Only if the city of its own accord chooses to take advantage of the Transit Authority Act and enter into an agreement, pursuant to its terms, with the transit authority, can the city's transit properties be transferred from the city to the authority.

It is also argued that chapters 204 and 205 of the Laws of 1953, which impose a condition upon the power of the city to raise the real estate tax rate, are unconstitutional because enacted without a request from the city and without concurrent action by two thirds of the members of each house of the Legislature. Chapters 204 and 205, however, do no more than lift, to a limited extent, theretofore existing restrictions upon the real estate tax rate. They do not force or compel the city to do anything. They confer benefits upon the city which the latter may reject. They impose no new burdens or restrictions upon the city. Their enactment therefore did not interfere in any way with the city's right to home rule. If the city does not wish to avail itself of the permission granted, it need not do so. The fact that the right of the city to take advantage of the provisions contained in chapters 204 and 205 was conditioned upon the city's entering into an agreement with the transit authority, as provided for in the Transit Authority Act, did not have the effect of changing the legal situation and making necessary a request by the city and approval by two thirds of each house of the Legislature.

Another attack upon the constitutionality of the Transit Authority Act is that it violates section 17 of article III of the Constitution, which prohibits the passage of a law authorizing the construction or operation of a street railroad without the consent of the local authorities in control of the street or highway upon which the construction or operation is to take place. The city recognizes, as indeed it must, that the Transit Authority Act does not compel the city, without its consent, to permit the authority to operate the city's transit facilities, for in the absence of a voluntary agreement by the city with the authority for the turnover to the latter of the former's transit lines, the ownership and operation of the transit facilities remain with the city. The latter argues, however, that if it should enter into such an agreement with the authority, it would be the result of " duress " on the part of the Legislature in compelling it to do so, by providing that otherwise the city could not avail itself of the increased taxing powers which the Legislature was conferring upon it. The court is unaware of any decisions, and none have been called to its attention, where it has been held that a Legislature can be guilty of duress vitiating its enactments. In any event, as previously observed in connection with the city's attack upon the constitutionality of the conditions annexed by the Legislature to the taxing powers granted by chapters 202–205, inclusive, of the Laws of 1953, the Legisla-

ture had a perfect right, in the public interest, to attempt to persuade the city by all the means at its command to transfer ownership and operation of the city's transit facilities to an independent public authority and to deny the city taxing powers which it could validly withhold from the city, unless the city should agree to such transfer.

The final contention to be disposed of is that the Transit Authority Act, which provides for the appointment of the chairman or a member of the Port of New York Authority as a member of the transit authority, imposes upon the Port of New York Authority powers and duties '' which may or may not conflict with and be inconsistent with the powers and duties which they owe to the interstate body.'' The city argues that the statute in effect '' constitutes an invalid attempt by New York State, acting alone, to modify the compact and the interstate laws (pursuant to which the Port of New York Authority was created), and is, therefore, invalid.'' There appears to be no merit whatsoever in this point. No duties are imposed upon the Port of New York Authority *itself* or upon any of its members *as such*. The mere fact that a member of the Port of New York Authority may in addition to his duties as such member also serve as a member of the transit authority has not been shown by the city to constitute a modification of or interference with the compact and the interstate laws creating the Port of New York Authority.

The various motions made by the respective parties are disposed of as follows: The motion for a temporary injunction is denied. The plaintiff's motion for leave to serve an amended complaint is granted. The plaintiff's motion to dismiss the city's notice of motion, and to strike out the city's answer or various matters therein alleged, is denied. *The city's motion for judgment on the pleadings declaring various chapters of the Laws of 1953 unconstitutional in whole or in part is denied. The motion of the Attorney-General for judgment on the pleadings declaring chapters 200 to 208, inclusive, constitutional is granted.* The motion of the Attorney-General to dismiss the complaint is denied and his motion to dismiss the cross demand of the city against him is denied as academic.